Filed in Fourth Judicial District Court
2/12/2016 4:01:47 PM
Hennepin County, MN

| | |
|---|---|
| **STATE OF MINNESOTA** | **DISTRICT COURT** |
| **COUNTY OF HENNEPIN** | **FOURTH JUDICIAL DISTRICT**<br>**CASE TYPE:  OTHER CIVIL** |

---

Upsher-Smith Laboratories, Inc.,

          Plaintiff,

v.

Fifth Third Bank,

          Defendant.

Case No.: _____

Judge: _____


**SUMMONS**

---

**THIS SUMMONS IS DIRECTED TO THE ABOVE-NAMED DEFENDANT.**

    **1.**    **YOU ARE BEING SUED.**  Plaintiff has started a lawsuit against you.  Plaintiff's Complaint against you is attached to this Summons.  Do not throw these papers away.  They are official papers that affect your rights.  You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this Summons.

    **2.**    **YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS.**  You must give or mail to the person who signed this summons **a written response** called an Answer within 20 days of the date on which you received this Summons.  You must send a copy of your Answer to the person who signed this Summons located at:

        **ANTHONY OSTLUND BAER & LOUWAGIE P.A.**
        3600 Wells Fargo Center
        90 South Seventh Street
        Minneapolis, MN 55402

    **3.**    **YOU MUST RESPOND TO EACH CLAIM.**  The Answer is your written response to Plaintiff's Complaint.  In your Answer you must state whether you agree or disagree with each paragraph of the Complaint.  If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

    **4.**    **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.**  If you do not answer within 20 days, you will lose this case.  You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint.  If you do not want to contest the claims stated in the Complaint, you do not need to respond.  A default judgment can then be entered against you for the relief requested in the Complaint.

#754453

**Exhibit A**

5.      **LEGAL ASSISTANCE**.  You may wish to get legal help from a lawyer.  If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance.  **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

6.      **ALTERNATIVE DISPUTE RESOLUTION**.  The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice.  You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

                    **ANTHONY OSTLUND**
                    **BAER & LOUWAGIE P.A.**


Dated:  February 12, 2016          By:  *s/Richard T. Ostlund*
                                        Richard T. Ostlund (#0144277)
                                        Randy G. Gullickson (#0185607)
                                        Steven C. Kerbaugh (#0390429)
                                   3600 Wells Fargo Center
                                   90 South Seventh Street
                                   Minneapolis, MN  55402
                                   Telephone:  612-349-6969

                                   rostlund@anthonyostlund.com
                                   rgullickson@anthonyostlund.com
                                   skerbaugh@anthonyostlund.com

                                   **ATTORNEYS FOR PLAINTIFF**

**STATE OF MINNESOTA**                    **DISTRICT COURT**

**COUNTY OF HENNEPIN**            **FOURTH JUDICIAL DISTRICT**
                                    **CASE TYPE:  OTHER CIVIL**

---

Upsher-Smith Laboratories, Inc.,          Case No.: _____
                                          Judge:_____
             Plaintiff,

v.                                        **COMPLAINT**

Fifth Third Bank,

             Defendant.

---

Plaintiff, Upsher-Smith Laboratories, Inc. ("Upsher-Smith"), as and for its Complaint against Defendant Fifth Third Bank ("Fifth Third"), states and alleges as follows:

## INTRODUCTION

1.     On June 17, 2014, Upsher-Smith senior management learned that over a period of less than three weeks an accounts payable employee directed Fifth Third to send foreign currency wire transfers totaling over $50 million from Upsher-Smith's operating account.  Each wire transfer was sent as part of a fraud scheme in which an individual purporting to be Upsher-Smith's Chief Executive Officer directed the accounts payable employee to follow the directions of a purported attorney, David Madison, and wire transfer large sums of money to foreign bank accounts in China and Slovakia.

2.     Between May 29 and June 17, 2014 and based solely on communications with a single Upsher-Smith employee alone, Fifth Third sent nine wire transfers of Upsher-Smith's funds, totaling $52,509,373.49.  Although Upsher-Smith was able to recall one wire, $39,792,783.53 of the money transferred was never recovered.  The fraud scheme was ultimately successful because Fifth Third acted solely on instructions of one Upsher-Smith employee

without the involvement of any Upsher-Smith manager or other employee and failed to obtain

separate confirmation of the legitimacy of these wire transfers, as required by both contract and

commercially reasonable banking practices under the facts presented.

3.     In sending these wire transfers based solely on instructions and confirmation from

a single Upsher-Smith employee, Fifth Third breached the contractual protocol governing

foreign wire transfers as agreed to by the parties.  Pursuant to its contract with Fifth Third, two

Upsher-Smith confirmations (both a "Primary Confirmation" and "Secondary Confirmation")

were necessary before Fifth Third was authorized to make wire transfers.  Fifth Third only

obtained one confirmation for each of the transfers in question.  If the required second

confirmation had been obtained by Fifth Third, the fraudulent scheme would have been detected

and the loss avoided.  Fifth Third's breach of contract with Upsher-Smith resulted in

unrecovered fraudulent transfers totaling more than $39 million.

4.     Not only did Fifth Third breach its contract with Upsher-Smith by executing the

foreign currency wire transfers, but the wire transfers were executed despite the existence of

multiple "red flags" that should have led reasonable and sophisticated bankers in the position of

Fifth Third to question Upsher-Smith senior executives – other than the lone, accounts payable

coordinator – about these highly irregular/unusual transactions.  Such questioning would have

revealed and prevented the fraud scheme, thereby preventing the fraudulent wire transfers from

being made.  Upon information and belief, Fifth Third – as a regulated bank – operates under

strict internal policies and/or protocols providing for approvals at higher levels of bank

management for significant wire transfers as executed under the facts of this case, which on

information and belief Fifth Third failed to follow in executing the wire transfers at issue.  The

policies and/or protocols are designed to protect bank customers like Upsher-Smith, the safety

and soundness of Fifth Third for the benefit of all bank customers and the safety and soundness

of the banking system in the United States.

5.      As a result of Fifth Third's breaches of its contractual and other legal duties, and

otherwise wrongful conduct, Upsher-Smith has suffered direct losses of $39,794,783.53, in

addition to expenses, fees, other consequential damages and interest at 10% under Minnesota

law.  Upsher-Smith's damages through trial will exceed $50 million.

## PARTIES

6.      Plaintiff Upsher-Smith Laboratories, Inc. is a Minnesota corporation with its

principal place of business located at 6701 Evenstad Drive, Maple Grove, MN 55369.  Upsher-

Smith is a privately-held pharmaceutical manufacturing, distribution and sales company.

7.      Upon information and belief, Defendant Fifth Third Bank is a nationally-

regulated bank incorporated in Ohio with its principal place of business located at 38 Fountain

Square Plaza, Cincinnati, Ohio 45263.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to Minn. Stat.

§ 484.01.

9.      This Court has personal jurisdiction over Fifth Third because Fifth Third has

continuously and systematically directed its activities at residents of this State, has purposefully

derived benefit from its business activities in this State, has created a substantial connection with

this State, has deliberately engaged in significant activities within this State, has created

continuing obligations between itself and residents of this State and has caused injury in

Minnesota.  Moreover, during the period of time relevant to this action Fifth Third maintained an

office in Minneapolis, Minnesota, at which Fifth Third employees doing business with Upsher-

Smith worked.  As such, subjecting Fifth Third to the jurisdiction of this Court will not violate

traditional notions of fair play and substantial justice. Minnesota further has a substantial interest in providing a forum.

10.     Venue is proper in this Court pursuant to Minn. Stat. § 542.09 because a substantial part of the events or omissions giving rise to Upsher-Smith's claims occurred in Hennepin County, Upsher-Smith has its principal place of business in Hennepin County and the actions of Fifth Third have caused injury in Hennepin County.

## FACTUAL ALLEGATIONS

11.     In June 2012, Upsher-Smith entered into a Credit Agreement with a syndicate of banks. JPMorgan Chase ("JPMorgan"), Wells Fargo and US Bank were the lead banks on the deal, with Upsher-Smith working primarily with JPMorgan, where it maintained an operating account. The credit relationship included a "swingline loan," which generally allowed Upsher-Smith to draw on its credit line on a short-term basis for funds needed to conduct company business.

12.     As is typical in credit relationships of this kind, the lead banks allocated some of the financing risks associated with the financing transaction to other banks that became participants in the credit facility. Fifth Third was one of several banks that became part of the bank group providing credit to Upsher-Smith. Fifth Third was aware of the swingline feature of the credit relationship.

13.     After Fifth Third became part of the bank group, Upsher-Smith began receiving calls from Neil Brenner ("Brenner"), Fifth Third's Managing Director – Foreign Exchange, seeking additional Upsher-Smith banking business for Fifth Third. Fifth Third had previously opened a foreign exchange office in Minneapolis to serve Minnesota-based companies that were conducting international business. According to Brenner, who managed Fifth Third's

4

Minneapolis foreign exchange office, opening of the office "illustrates [Fifth Third's] commitment to the Minnesota business community."

14.     Based upon Brenner's solicitations, Upsher-Smith agreed to move its foreign currency wire transfer business to Fifth Third.  In approximately August 2013, Fifth Third became Upsher-Smith's primary foreign currency wire transfer service provider.

15.     Upsher-Smith and Fifth Third entered into a contractual relationship pursuant to which Fifth Third would send foreign currency wire transfers from funds it would receive from an Upsher-Smith bank account at JPMorgan.  Funds for wire transfers were to be drawn directly from Upsher-Smith's operating account at JPMorgan.  If sufficient funds were not available in the account, the funds would be loaned to Upsher-Smith by means of a draw from the swingline.

16.     As part of the contractual relationship, Fifth Third required that Upsher-Smith be "accurately" set up in Fifth Third's foreign exchange ("FX") systems "to satisfy compliance requirements."  Among the "required documentation" needed to set up Upsher-Smith's FX account and to "meet compliance requirements" was a "FX Customer Information Form."  This Form required, among other things, the designation of multiple Upsher-Smith contacts "for confirmations."  These included a "Primary Confirmation Contact," a "Secondary Confirmation Contact," and at least one "Optional Confirmation Contact."  A copy of the FX Customer Information Form is attached hereto as **Exhibit A**.

17.     On or about July 30, 2013, Upsher-Smith sent the completed "FX Customer Information Form" to Fifth Third.  The form submitted by Upsher-Smith designated its Senior Accounts Payable Coordinator ("AP Coordinator") as the "Primary Confirmation Contact," Upsher-Smith's Manager of General Accounting ("GA Manager") as the "Secondary Confirmation Contact," and its Manager of Accounting and Control ("A&C Manager") as the

5

"Optional Confirmation Contact." Thus, under the contract between Upsher-Smith and Fifth Third, any foreign currency wire transfer was authorized only by Fifth Third confirming the wire transfer in advance with at least two Upsher-Smith Confirmation Contacts.

18.     From the time Fifth Third began providing foreign currency wire transfers for Upsher-Smith in late August 2013 until late May 2014, Fifth Third on average executed approximately six foreign currency wire transfers per month for Upsher-Smith, generally to recipients in Western Europe or Canada. None of these wire transfers ordered by Upsher-Smith were to banks or recipients in China or Slovakia.

19.     Prior to May 2014, Upsher-Smith's requests to Fifth Third for foreign currency wire transfers generally came in the form of emails from Upsher-Smith's AP Coordinator to Fifth Third, with at least one other Upsher-Smith manager-level employee shown as being copied on the email.

20.     Beginning on approximately May 25, 2014, Upsher-Smith's Chief Executive Officer was in Europe for business and personal travel.

21.     On May 29, 2014, Upsher-Smith's AP Coordinator received an email purporting to be from the CEO. That e-mail indicated that an attorney, David Madison ("Madison"), would contact her. The e-mail further stated, that "[w]e are currently acquiring a company and so we will be needing your direct attention concerning accounting documents to finalize this acquisition." The e-mail further stated, "I gave all the power to our Attorney that will be handing this operation," and it directed the AP Coordinator to "execute everything he needs." Finally, the e-mail directed the AP Coordinator to keep the information contained therein confidential until Upsher-Smith made a public announcement regarding the acquisition. In fact,

but unbeknownst to the AP Coordinator, this email was not actually from the CEO but was instead from a person or persons perpetrating a fraud on Upsher-Smith.

22.     Shortly thereafter, the AP Coordinator responded to the e-mail purporting to be from the CEO and stated that she would do her "best to provide what is asked for."  She further indicated that she had "full understanding of [his] request to keep quiet and handle all of Mr. Madison's requests [her]self."

23.     The e-mail purporting to be from Upsher-Smith's CEO was not from his Upsher-Smith email account, but the AP Coordinator assumed that he was using a different e-mail address due to confidentiality concerns.

24.     Shortly after the email, Madison called the AP Coordinator at work and said that he understood that the CEO had reached out to her, that she needed to keep everything confidential and that she needed to do what the CEO said to do.  Madison told the AP Coordinator that he would need foreign currency wire transfers, that the first would represent three percent of the down payment for an acquisition, and that he would need her to make additional transfers.  Madison further told the AP Coordinator that because of the type of acquisition they were involved with, there would be fees, penalties and job losses if she talked to anyone about the transfers or acquisition.

25.     On May 29, 2014, Madison requested that the AP Coordinator provide him with information about Upsher-Smith's bank accounts and bank balances, and the AP Coordinator emailed account information to Madison.

26.     Madison asked the AP Coordinator about the daily foreign currency wire transfer limit.  The AP Coordinator then asked Upsher-Smith's A&C Manager about the daily limit, and the A&C Manager called Melissa Sullivan ("Sullivan") at Fifth Third to find out.

27.     Before getting an answer from the A&C Manager, the AP Coordinator e-mailed Brenner and Sullivan at Fifth Third on May 29 at 11:04 a.m., asking if she "need[ed] to do a wire in euros sometime today can we make it a same day transaction?"  Such a "same day transaction" would have been inconsistent with the manner in which foreign currency wire transfers had been processed by Fifth Third for Upsher-Smith in the past.  Sullivan replied that 10:00 a.m. is the outside cutoff time for a same day transaction due to the time difference in Europe.

28.     Upon information and belief, Sullivan informed the A&C Manager that the daily limit was $25 million.  The A&C Manager told the AP Coordinator that the limit for foreign wire transfers was $25 million, and the AP Coordinator then relayed this information to Madison.

29.     At 1:12 p.m. on May 29, 2014, Madison provided the AP Coordinator "details for the first (deposit) payment," requesting that she initiate an international wire transfer in the amount of 930,780 Euro (or approximately $1.28 million) to the beneficiary "CBSC INVESTMENT CO. LTD." through "Ping and Bank Co. ltd" in China.  Based on Upsher-Smith's prior foreign currency wire transfers, this was an unusual request.

30.     On May 29, 2014, the AP Coordinator e-mailed Brenner and Sullivan at Fifth Third with this information and stated "[w]e need to set this up for next day please.  This can not wait the two day cycle we normally do."  Unlike prior practice with respect to foreign currency wire transfer requests to Fifth Third, the AP Coordinator did not copy her email to anyone else at Upsher-Smith and she stated to Fifth Third that "[t]his is a confidential matter . . . [p]lease if you have any questions to contact me directly."  The AP Coordinator also asked whether it is "possible to have the confirmation emailed to me this one time?  If not, can I receive a phone call prior to faxing it, I need to be ready to grab it."

8

27-CV-16-1982

CASE 0:16-cv-00556-JRT-HB   Document 1-1   Filed 03/03/16   Page 11 of 43   Filed in Fourth Judicial District Court
2/12/2016 4:01:47 PM
Hennepin County, MN

31.     The content and nature of the AP Coordinator's request to Fifth Third should have triggered heightened concern, senior approvals and the need for assured secondary, senior approval, from Upsher-Smith to Fifth Third for several reasons, including the fact that it differed from the contract, it differed from established practice, it was unusual as to size, timing, recipient, and alleged confidentiality; and it was subject solely to the AP Coordinator's purported authorization when Fifth Third knew two confirmations were required. The AP Coordinator's conduct raised multiple red flags that would have alerted a reasonable bank employee with responsibility for foreign currency wire transfers that this request should not be approved. For example, the unusual and rushed nature of the request, the insistence on confidentiality, the request that Fifth Third depart from ordinary procedures by e-mailing the wire confirmation (or, alternatively, the AP Coordinator's insistence that she get a phone call prior to the fax being sent), and the AP Coordinator's failure to follow her established practice of copying another Upsher-Smith employee on the wire transfer request – all coming on the heels of unusual requests about the daily wire transfer limit and the ability to do same day transactions – all placed Fifth Third on notice that this was a suspect, irregular transaction that should not be approved.

32.     Despite these red flags, at 1:58 p.m., Sullivan wrote the AP Coordinator that she "just executed this deal . . . ." Sullivan further stated that "Gina Stewart will be calling you momentarily to confirm." The transfer of the $1.28 million went out the next day.

33.     On May 30, 2014, Madison wrote the AP Coordinator an e-mail indicating that they "might need to conclude another deposit today." After exchanging e-mails, Madison provided the AP Coordinator with instructions for a second wire transfer. Specifically, Madison wrote to the AP Coordinator "[t]o follow our phone conversation, we will proceed with the

outstanding 17% which will conclude the initial deposit." Madison told the AP Coordinator to wire 5,274,420 Euro (approximately $7.29 million) to beneficiary "CBSC INVESTMENT CO. LIMITED" at "Ping and Bank Co ltd" in China.

34.     Subsequently, the AP Coordinator e-mailed Brenner and Sullivan at Fifth Third at 12:54 p.m., indicating that she needed a wire to occur on Monday and that it "can not wait the two day cycle we normally do." The AP Coordinator reiterated that "[t]his is a confidential matter" and directed Brenner and Sullivan to contact her directly with any questions.

35.     The AP Coordinator's instruction e-mail for this large, "confidential" and unusual wire transfer, without copying any other Upsher-Smith employee, again should have raised concerns at Fifth Third, especially given that it followed just a day after another highly irregular substantial foreign wire transfer request.

36.     Despite this, Fifth Third executed the wire transfer and Brenner responded to the AP Coordinator's e-mail at 1:08 p.m., confirming that the wire had been executed.

37.     On June 2, 2014, Madison sent an e-mail to the AP Coordinator requesting that she provide him with the swift confirmation numbers ("MT103s") for the two wire transfers that were previously executed by Fifth Third. At 8:42 a.m., the AP Coordinator e-mailed Brenner and Sullivan at Fifth Third requesting the swift confirmation numbers, which Gina Stewart ("Stewart") at Fifth Third provided to the AP Coordinator, who then forwarded the numbers to Madison.

38.     On June 3, 2014, Madison provided the AP Coordinator information for a third wire transfer and requested a transfer for 7,229,058 Euro (approximately $9.974 million) to beneficiary "Bartolo S.r.o" at "Tatra Banka" in Bratislava.

39.     The AP Coordinator e-mailed Brenner and Sullivan at Fifth Third at 7:08 a.m., providing the transfer information.  The AP Coordinator stated, "One more to do and it will need to be 'same day'" and that this was a "confidential matter."

40.     Again, despite the repeated pattern of red flags, Fifth Third went through with the wire transfer in violation of the two confirmation requirements and without added reasonable due diligence in light of these multiple irregular wire transfer requests.  At 7:26 a.m., Brenner responded that Upsher-Smith purchased "7,229,058 Euros, Rate 1.3798, $9,974,645.23 value today 6/3/14.  USD will be taken from JP Morgan account on file."  Fifth Third also sent the AP Coordinator a copy of the MT103, which the AP Coordinator provided to Madison.

41.     After the AP Coordinator provided Madison with the MT103s from earlier on June 3, Madison e-mailed the AP Coordinator at 9:00 a.m., stating that she should receive the order for the next payment soon and wanting to know if they were "still in time for same day value."

42.     Madison then provided the AP Coordinator with the order for the "last transfers." Specifically, Madison requested 4,653,900 Euro (approximately $6.414 million) to beneficiary "Bartolo S.r.o" through Tatra Banka A.S. in Bratislava and 2,871,082 Euro (approximately $3.957 million) to beneficiary "Sunny Billion Limited" through "Ping an Bank Co. Ltd." in China.

43.     The AP Coordinator e-mailed this information to Fifth Third at 9:38 a.m.  She stated that these were the "last two transfers" and requested that Stewart help her "one more time with the MT103 for these two trades . . . ."

44.     Fifth Third then called the AP Coordinator to confirm the wires.  Upon information and belief, a Fifth Third representative expressed suspicion about these transfer

requests.  The AP Coordinator wrote to Madison, "[o]h boy the bank just called and they are curious.  No questions were asked but ensured me they are on it ASAP."  Despite its expressed suspicion, Fifth Third nonetheless executed the wire transfers and failed to bring any concerns to anyone at Upsher-Smith except the AP Coordinator, despite the fact that by contract and under reasonable commercial practice Fifth Third was required to seek an additional confirmation beyond the AP Coordinator for wire transfers.

45.     Fifth Third repeatedly ignored indicia of commercially irregular and/or fraudulent activity in approving and executing these wire transfers, both independently and in the aggregate as a pattern over a short time period.

46.     At 9:52 a.m. on June 3, 2014, Brenner e-mailed the AP Coordinator stating that Upsher-Smith purchased "4,653,900 Euros.  Rate 1.3783.  $6,414,470.37, value today" and "2,871,082 Euros.  Rate 1.3783.  $3,957,212.32, value today."  Brenner said the Fifth Third Bank office would call to confirm shortly.

47.     Less than one hour later, at 10:38 a.m. on June 3, 2014, the AP Coordinator emailed Brenner indicating frustration that "[t]his one is taking longer than the ones before" and "I'm under the gun as far as timing."  Brenner immediately directed Stewart to confirm the trades "asap."  She did so; Fifth Third then provided the MT103s for these two payments at 10:54 a.m. on June 3, 2014

48.     On June 4, 2015, Madison sent the AP Coordinator an e-mail requesting confirmation that needed to be tracked for the initial May 29 wire transfer of $1.28 million.  At 8:26 a.m., the AP Coordinator sent an e-mail to Brenner attaching "a confirmation that needs to be tracked" for the May 29 wire transfer.  Brenner responded by stating that the "[f]unds were credited under Deutsche Bank's reference number 03MT140530103163."

49.     On June 5, 2014, Madison wrote to the AP Coordinator stating that he needed the reference information for the third and fourth wire transfers.   The AP Coordinator then e-mailed Brenner at Fifth Third at 7:35 a.m., stating that she needed "the reference number [he] supplied [her] yesterday" for the third and fourth wire transfers.   At 8:44 a.m., Brenner provided the reference numbers to the AP Coordinator, who forwarded the information to Madison.

50.     On June 9, 2014, Madison e-mailed the AP Coordinator to tell her that a beneficiary had not received a deposit yet and to check with Fifth Third.   Madison said that he believed "the funds haven't reached the beneficiaries due to the fact of the intermediary account."   Madison also told the AP Coordinator that there would be two more payments that need to be made.   One transfer was for 528,700 Euro (or approximately $726,063) to beneficiary "Bartolo S.r.o" through Tatra Banka in Bratislava.   The other transfer for 4,229,058 Euro (or approximately $5.807 million) to the beneficiary "Chunlei Co. Limited" through Bank of Communications Co., Ltd. in China.

51.     In response to Madison's request, the AP Coordinator e-mailed Brenner and Sullivan at Fifth Third requesting information about payments that the beneficiaries had not received.   She also sent them details for the sixth and seventh wire transfers.

52.     Despite the above-mentioned indicia of fraud and the suspicions that should have been raised as a result of the number and amounts of wire transfers being sent to multiple beneficiaries through multiple intermediary banks, and despite the AP Coordinator's previous identification of the prior requests as the "last two transfers," Fifth Third complied with the AP Coordinator's requests.   Sullivan responded at 7:42 a.m. on June 9, 2014 that Upsher-Smith had purchased "4,229,058 Euros.  Rate 1.3733, $5,807,765.35 for value Monday 6/9/14" and "528,700 Euros.  Rate 1.3733, $726,063.71 for value Monday 6/9/14."  Then, at 9:52 a.m.,

Sullivan e-mailed the AP Coordinator the details for the first five wire transfers, including the corresponding reference numbers and intermediary bank information.

53.     On June 11 at 10:58 a.m., the AP Coordinator e-mailed Fifth Third and asked it to "clear the last 2 payments that we did on Monday." At 12:13 p.m., Fifth Third responded that "[i]t appears that the funds were indeed received and applied to the correct account per the below. Ping An Bank will not be granting debit authority to return the funds given that they were received and applied as instructed." The AP Coordinator then forwarded this e-mail to Madison.

54.     During the morning of June 16, 2014, Madison contacted the AP Coordinator to request that she have the bank send an additional wire transfer. At 8:29 a.m., the AP Coordinator e-mailed Brenner and Sullivan at Fifth Third stating that there is another payment that needs to be made. Specifically, the AP Coordinator requested a transfer to the "Bank of Communications Ltd" for beneficiary "Hongxuan Development Co. Limited" for 3,157,600 Euro.

55.     Fifth Third again ignored the numerous indicia of commercial irregularity, fraud and the requirements of the contract and executed the wire transfer. At 8:50 a.m., Sullivan responded that "[t]he below is all set @1.3736, USD $4,337,279.36." The AP Coordinator then forwarded that e-mail to Madison.

56.     In response, Madison stated, "we just got the confirmation that we have to buy the parts of another bail out investor." He then provided the details for a ninth wire transfer. Specifically, Madison requested a transfer to "Agricultural Bank of China" for beneficiary "Qingtian Ye Suping Foreign Trade Service Co ltd" for 9,264,600 Euro ($12,716,589.96).

57.     At 11:13 a.m. on June 16, 2014, the AP Coordinator sent this information to Fifth Third stating "[s]orry one more . . . valued today[.]" Sullivan responded, "I have confirmed that

we cannot do today's value for the below payment (10:00 is the latest we can process for same day).  Would you like me to proceed and value for tomorrow 6/17?"  The AP Coordinator replied at 12:13 p.m. that the bank should proceed with a value date of June 17.  Sullivan responded, "[y]ou got it" and stated, "Upsher Smith buys EUR 9,264,600 @1.3726, USD $12,716,589.95 for value 6/17/14."

58.     The AP Coordinator informed Madison that Fifth Third wanted "an intermediary bank to send this through" given the high dollar amount.  Madison responded that the intermediary bank would be Deutsche Bank AG in Germany, and the AP Coordinator sent that information to Fifth Third.  Stewart at Fifth Third responded that Fifth Third would process it shortly.

59.     On June 17, 2014, the AP Coordinator e-mailed Stewart at Fifth Third requesting information relating to the eighth wire.  Stewart responded at 7:50 a.m. with the MT103 for the eighth wire transfer.

60.     Also on June 17, 2014, Upsher-Smith initially discovered that it had apparently been the subject of a fraud.  Upsher-Smith management learned of the initial May 29 email to the AP Coordinator that purported to be from the CEO and soon discovered that the CEO did not send that email.  The AP Coordinator then disclosed to Upsher-Smith senior management the extent of the wire transfers executed by Fifth Third at her request.

61.     All wire transfers sent from Upsher-Smith as part of the fraud scheme were requested by the AP Coordinator based on a mistaken belief that she was acting at the direction of the CEO, directly and/or through the attorney identified as Madison.

62.     The AP Coordinator alone ordered the wire transfers.  She also hid evidence of her actions from other Upsher-Smith employees.

15

27-CV-16-1982

CASE 0:16-cv-00556-JRT-HB   Document 1-1   Filed 03/03/16   Page 18 of 43   Filed in Fourth Judicial District Court
2/12/2016 4:01:47 PM
Hennepin County, MN

63.     Upon discovering the AP Coordinator's actions and the extent of the fraud,

Upsher-Smith's Chief Financial Officer contacted Fifth Third to tell it to suspend all wires and

not conduct any further transactions.

64.     At 11:54 a.m. on June 17, 2014, Sullivan at Fifth Third sent an e-mail to others

within Fifth Third with the subject line "URGENT RECALL REQUEST." The e-mail stated

"[p]lease urgently recall deal 2014061600424 for Upsher Smith in the amount of EUR

9,264,600."

65.     The fraudulent wire transfers executed by Fifth Third solely upon the AP

Coordinator's instruction and without secondary or further independent authorization are as

follows (and shall hereafter collectively be referred to as the "Transfers"):

| Contract Date | Value Date | Deposit Bank | Beneficiary | Value (USD) |
|---|---|---|---|---|
| May 29, 2014 | May 30, 2014 | Ping an Bank Co. Ltd. | CBSC Investment | $ 1,285,034.87 |
| May 30, 2014 | June 2, 2014 | Ping an Bank Co. Ltd. | CBSC Investment | 7,290,303.32 |
| June 3, 2014 | June 3, 2014 | Tatra Banka A.S. | Bartolo s.r.o. | 9,974,654.23 |
| June 3, 2014 | June 3, 2014 | Tatra Banka A.S. | Bartolo s.r.o. | 6,414,470.37 |
| June 3, 2014 | June 3, 2014 | Ping an Bank Co. Ltd. | Sunny Billion Limited | 3,957,212.32 |
| June 9, 2014 | June 9, 2014 | Tatra Banka A.S. | Bartolo s.r.o. | 726,063.71 |
| June 9, 2014 | June 9, 2014 | Bank of Communications Co. LTD | Chunlei Co. Limited | 5,807,765.35 |
| June 16, 2014 | June 16, 2014 | Bank of Communications Co. LTD | Hongxuan Development Co. Limited | 4,337,279.36 |
| June 16, 2014 | June 17, 2014 | Agricultural Bank of China | Qingtian YE Suping Foreign Trade Service Co. LTD | 12,716,589.97 |

66.     Ultimately, Upsher-Smith was able to recover the final $12,746,589.97 Transfer, but it was unable to recover any of the other wire Transfers executed by Fifth Third.

67.     Upsher-Smith's direct losses as a result of the fraud scheme totaled $39,792,783.53.   With interest and other consequential losses, its damages through trial will exceed $50 million.

68.     Fifth Third executed every wire transaction initiated by the AP Coordinator despite the existence of numerous indicia of fraud, including without limitation:  (1) the rushed nature of the AP Coordinator's requests; (2) the AP Coordinator's insistence on confidentiality; (3) the AP Coordinator's request that Fifth Third depart from ordinary procedures by e-mailing the AP Coordinator wire confirmations (or, alternatively, insisting that the AP Coordinator get a telephone call prior to facsimile confirmation being sent so that the AP Coordinator could intercept the confirmation); (4) the AP Coordinator's failure to follow the established practice of copying another Upsher-Smith employee on the Transfer requests; (5) the amounts and frequency of the Transfers (which should have been particularly alarming in light of the comparatively small and infrequent number of foreign wire transfers prior to May 2014); (6) the numerous intermediary banks for the Transfers; and (7) the suspicious beneficiaries of the Transfers.

69.     Fifth Third executed all of the Transfers upon the AP Coordinator's confirmation alone despite the fact that the contractual relationship, as documented in the FX Customer Information Form, specifically required that Fifth Third obtain confirmation from both a Primary and a Secondary Confirmation Contact.

70.     Fifth Third also hindered Upsher-Smith's ability to perform its obligations under the contract by failing to allow a secondary Upsher-Smith employee to approve the Transfers.

17

71.    Fifth Third was obligated under the contract to obtain a secondary confirmation from Upsher-Smith. It was the clear intent of the agreement that someone with more authority within the organization than the AP Coordinator should be contacted with regard to each wire transfer. Fifth Third had the discretion to either obtain that approval from the individuals identified as contacts in the contract or to do more than was required by going directly to an officer of Upsher-Smith, such as its Chief Executive Officer or Chief Financial Officer, to seek approval for the Transfers. Given the significant red flags that were present in this action, Fifth Third should have obtained officer-level approval for the Transfers. Its failure to do so was an unreasonable exercise of its discretion under the contract.

72.    Upon information and belief, as a regulated financial institution, Fifth Third had, or should have had, internal policies and/or regularly required approvals at higher levels of bank management for wire transfers that are of a sufficient frequency or size, or which meet other criteria creating a higher level of risk, in the event that the wire transfers are fraudulent, unauthorized or otherwise improper. Upon information and belief, these internal policies, as regularly required, should have caused Fifth Third to inquire of Upsher-Smith in a manner and at an appropriate level of management that would have resulted in detection of the fraudulent and/or unauthorized nature of the wire transfers at issue in this case, and would have prevented the fraudulent wire transfers and the resulting damages to Upsher-Smith.

## COUNT I
### (Breach of Contract)

73.    Upsher-Smith restates and incorporates by reference each and every paragraph of this Complaint as if fully set forth herein.

74.    The parties entered into a binding and enforceable contractual relationship when they agreed that Fifth Third would send foreign currency transfers from funds it would receive

from an Upsher-Smith account at JPMorgan. That contract, drafted and required by Fifth Third, is established and/or evidenced by the completed FX Customer Information Form required by Fifth Third Bank.

75.     Fifth Third formed and entered into a valid and binding contract with Upsher-Smith whereby Upsher-Smith agreed to use Fifth Third as its bank for foreign currency wire transfers, and Fifth Third agreed to execute such transfers in accordance with the FX Customer Information Form, which requires a "Primary Confirmation Contact" and a "Secondary Confirmation Contact" for all foreign currency wire transfers.

76.     Upsher-Smith performed any and all conditions precedent to the extent that they were required by the contract between the parties.

77.     By the conduct discussed herein, notably including failure to obtain two independent confirmations that Fifth Third was authorized to effectuate the Transfers from both a Primary and a Secondary Confirmation Contact, Fifth Third violated the security protocol set forth in the FX Customer Information Form and therefore breached the contract between the parties.

78.     As a direct and proximate result of Fifth Third's breach of contract, Upsher-Smith has been harmed and is entitled to damages, including without limitation Upsher-Smith's direct losses of $39,794,783.53, interest, expenses, fees and other consequential losses.

## COUNT II
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

79.     Upsher-Smith restates and incorporates by reference each and every paragraph of this Complaint as if fully set forth herein.

80.     Based upon the contract identified above, Fifth Third is subject to a covenant of good faith and fair dealing to Upsher-Smith.

81.     By the above-described conduct, Fifth Third has breached the covenant of good

faith and fair dealing.  This conduct evaded the spirit of the parties' contract and breached duties

fairly inferable from the express terms of said contract.  This conduct includes, but is not limited

to arbitrarily exercising contractual discretion and hindering contractual performance by Upsher-

Smith.

82.     In breaching the covenant of good faith and fair dealing, Fifth Third acted in bad

faith and with an ulterior motive.

83.     As a result of said breach, Upsher-Smith has been harmed and is entitled to

damages, including without limitation Upsher-Smith's direct losses of $39,794,783.53, interest,

expenses, fees and other consequential losses.

## COUNT III
### (Article 4A-202 of the Uniform Commercial Code)

84.     Upsher-Smith restates and incorporates by reference each and every paragraph of

this Complaint as if fully set forth herein.

85.     Pursuant to Minn. Stat. § 336.4A-204, a bank is obligated to reimburse a customer

for funds transferred pursuant to a payment order that is not authorized and not effective as an

order of the customer under Minn. Stat. § 336.4A-202.

86.     None of the Transfers initiated by the AP Coordinator were authorized by Upsher-

Smith, and they were not effective as an order of Upsher-Smith pursuant to Minn. Stat.

§ 336.4A-202.

87.     The AP Coordinator did not have authority to initiate the Transfers.

88.     The security procedure for foreign wire transfers in place at Fifth Third was not a

commercially reasonable method of providing security against unauthorized payment orders.

27-CV-16-1982

CASE 0:16-cv-00556-JRT-HB   Document 1-1   Filed 03/03/16   Page 23 of 43   Filed in Fourth Judicial District Court
2/12/2016 4:01:47 PM
Hennepin County, MN

89.     Fifth Third did not accept any payment order related to the Transfers in good faith.

90.     Fifth Third's acceptance of the payment orders associated with the Transfers was not in compliance with the written agreement or instruction of Upsher-Smith restricting acceptance of payment orders issued in the name of Upsher-Smith.  Specifically, Fifth Third failed to obtain a Primary Confirmation and a Secondary Confirmation from two Upsher-Smith representatives.

91.     Fifth Third's actions in effecting the unauthorized Transfers were not in compliance with Article 4A-202 of the Uniform Commercial Code or Minn. Stat. § 336.4A-202.

92.     Within one year of the first fraudulent wire transfer on May 29, 2014, Upsher-Smith provided Fifth Third with written objection to Fifth Third's payment of Transfers that are the subject of this action, consistent with Minn. Stat. § 336.4A-505.

93.     Fifth Third has failed and/or refused to reimburse Upsher-Smith for the unauthorized Transfers as required by Minn. Stat. § 336.4A-204.

94.     As a direct and proximate result of Fifth Third's conduct in effecting the unauthorized Transfers, Upsher-Smith has been harmed and is entitled to damages, including without limitation a refund of Upsher-Smith's direct losses of $39,794,783.53, interest, expenses, fees and other consequential losses.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Upsher-Smith prays this Court for an Order granting the following relief:

1.     Award Upsher-Smith damages in an amount in excess of $50,000;

2.     Award Upsher-Smith its costs, disbursements and attorneys' fees to the extent allowed by law; and

21

Filed in Fourth Judicial District Court
2/12/2016 4:01:47 PM
Hennepin County, MN

3.     Award such other and further relief as the Court may deem just and equitable.

## DEMAND FOR A JURY TRIAL

Upsher-Smith demands a jury trial on any and all claims or issues in this matter so triable.

ANTHONY OSTLUND
BAER & LOUWAGIE P.A.

Dated:  February 12, 2016                    By: *s/Richard T. Ostlund*
                                                  Richard T. Ostlund (#0144277)
                                                  Randy G. Gullickson (#0185607)
                                                  Steven C. Kerbaugh (#0390429)
                                             3600 Wells Fargo Center
                                             90 South Seventh Street
                                             Minneapolis, MN  55402
                                             Telephone:  612-349-6969

                                             rostlund@anthonyostlund.com
                                             rgullickson@anthonyostlund.com
                                             skerbaugh@anthonyostlund.com

                                             **ATTORNEYS FOR PLAINTIFF**

## ACKNOWLEDGMENT

Upsher-Smith Laboratories, Inc., by its attorneys, Anthony Ostlund Baer & Louwagie, P.A., acknowledges that sanctions may be imposed in this civil action under the terms of Minn. Stat. § 549.211.

                                             *s/Richard T. Ostlund*
                                             Richard T. Ostlund



**Fw: UPSHER-SMITH LABORATORIES, INC FX account information for Fifth Third Bank**

REDACTED   to:   REDACTED                                    07/22/2013 03:49 PM

REDACTED

Manager, Accounting & Control
Upsher-Smith Laboratories, Inc.
6701 Evenstad Drive | Maple Grove, MN 55369
☎ 763.315.2049 | 🖷 763.315.2138
✉   REDACTED   | www.upsher-smith.com

Advancing pharmacotherapy. Improving life!
— Forwarded by   REDACTED   on 07/22/2013 03:49 PM —

| | |
|---|---|
| From: | Capital Markets Documentation <CapitalMarketsDocumentation@53.com> |
| To: | REDACTED |
| Cc: | Capital Markets Documentation <CapitalMarketsDocumentation@53.com>, "Brenner, Neil" <Neil.Brenner@53.com>, "JOSH.LIVINGSTON@53.com" <JOSH.LIVINGSTON@53.com> |
| Date: | 07/11/2013 10:45 AM |
| Subject: | UPSHER-SMITH LABORATORIES, INC FX account Information for Fifth Third Bank |

UPSHER-SMITH LABORATORIES, INC

Thank you for choosing Fifth Third Bank for your foreign exchange needs. We appreciate the opportunity to understand and meet your current Foreign Exchange needs while helping you plan for your future endeavors. In order to setup your organization accurately in our FX systems and to satisfy compliance requirements, we will need your assistance in gathering certain information about your organization. Please provide the following:

### REQUIRED DOCUMENTATION

- ~~FX Customer information~~ please open and complete the attached FX Customer Information Form. This information is being requested, and is required to be returned, at the time of setup of your FX Account to meet compliance requirements.

### OPTIONAL DOCUMENTATION

(Please note that based on your anticipated FX needs, the information below is not currently required and you are only currently required to provide a completed FX Customer Information Form to move forward with your FX Account setup. As this additional information may be required in the future 1) if your FX needs change, or 2) due to changes in compliance requirements, it would be helpful to have this information completed and on file to avoid

possible delays in the future)    FN1 W9

- A current IRS tax form W9/W8 dated within the last 60 calendar days — required for IRS compliance and under the Foreign Account Tax Compliance Act (FATCA). For further information on FATCA please see:
  http://www.irs.gov/Businesses/Corporations/Foreign-Account-Tax-Compliance-Act-(FATCA). Please note that per IRS Requirements, any W8 provided to Fifth Third Bank must be an original, no copies of a W8 can be accepted.

- Legal Entity Identifier (LEI) - If you have already registered, please provide your LEI (CICI) in your response to this request. If you have not yet obtained an LEI, this link will guide you through the website where you can register for an LEI.

- Fifth Third Counterparty Guarantor Questionnaire (attached for completion by an authorized party) – Please note that similar questionnaires are specific to each respective financial institution and regulations require a separate Fifth Third Counterparty-Guarantor Questionnaire for each person or entity that executes a document or agreement with Fifth Third.

Please return the above listed information/documentation via email to CapitalMarketsDocumentation@53.com when available.

Once your information has been returned and reviewed, you will be setup in our FX systems; we will contact you if any information you have provided needs to be reviewed or discussed further to ensure accuracy for regulatory compliance. As government regulations and rules become finalized, including the Dodd-Frank Wall Street Reform and Consumer Protection Act and the Foreign Account Tax Compliance Act, it is possible that further information and/or documentation may be required. Fifth Third will strive to minimize the number of requests for information. Please feel free to contact us with any questions regarding this request. We look forward to working with you to meet your Foreign Exchange needs.

Kind Regards,

**Ryan Coats**
**Fifth Third Bank – Capital Markets**
513-534-7238
Ryan.Coats@53.com

This e-mail transmission contains information that is confidential and may be privileged. It is intended only for the addressee(s) named above. If you receive this e-mail in error, please do not read, copy or disseminate it in any manner. If you are not the intended recipient, any disclosure, copying, distribution or use of the contents of this information is prohibited. Please reply to the message immediately by informing the sender that the

Filed in Fourth Judicial District Court
2/12/2016 4:01:47 PM
Hennepin County, MN

# FIFTH THIRD BANK

## FX CUSTOMER PROFILE

**Legal Name of Counterparty** (please use the name as it appears in its organizational documents as registered in its jurisdiction of organization): Upsher - Smith Laboratories, Inc.

**Principal Address** (please use the address as it appears in its organizational documents as registered in its jurisdiction of organization):

Address (No P.O. Boxes): 6701 Evanstad Drive

City: Maple Grove    State: MN    Zip Code: 55391

**Customer Designation:**

- [ ] Bank
- [ ] Commodity Pool
- [x] Corporation
- [ ] Endowment
- [ ] ERISA
- [ ] Individual
- [ ] Insurance Company
- [ ] LLC
- [ ] LLP
- [ ] Mutal Fund
- [ ] Partnership
- [ ] Sate or Municipal Pension Plan
- [ ] Trust
- [ ] Other:

**US Tax Identification Number** (if applicable, may not apply for certain foreign entities): REDACTED

## CONTACT INFORMATION FOR CONFIRMATIONS

**Fax# for Confirmations:** 763-315-2138    **Phone#:** 763-315-2129

**Mailing Address for Confirmations** (if different from above, used if hard copies need to be mailed):

Address (No P.O. Boxes):

City:    State:    Zip Code:

Primary Confirmation Contact: REDACTED    Phone#: 763-315-2129

Email Address: REDACTED

Secondary Confirmation Contact: REDACTED    Phone#: 763-315-2434

Email Address: REDACTED

Optional Confirmation Contact: REDACTED    Phone#: 763-315-2049

Email Address: REDACTED

Optional Confirmation Contact:    Phone#:

Email Address:

If you will be transacting via Internet trading on FXALL or MISYS please advise and provide the related ID:
(please contact your Fifth Third FX Sales Representative to discuss if needed)

MISYS ID:    [ ] FX Match MISYS

FXALL ID:    [ ] FX Match FXALL

Form **W-9**
(Rev. December 2011)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer
Identification Number and Certification**

Give Form to the
requester. Do not
send to the IRS.

Name (as shown on your income tax return)
Upsher-Smith Laboratories, Inc.

Business name/disregarded entity name, if different from above

Check appropriate box for federal tax classification:
☐ Individual/sole proprietor   ☐ C Corporation   ☑ S Corporation   ☐ Partnership   ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

☐ Other (see instructions) ▶

☐ Exempt payee

Address (number, street, and apt. or suite no.)
6701 Evenstad Drive

Requester's name and address (optional)

City, state, and ZIP code
Maple Grove MN 55369

List account number(s) here (optional)

Print or type
See Specific Instructions on page 2.

**Part I    Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

Note. If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

Employer identification number
**REDACTED**

**Part II    Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 4.

Sign
Here

Signature of
U.S. person ▶

**REDACTED**

Date ▶ 7/30/2013

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

Note. If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

Cat. No. 10231X

Form **W-9** (Rev. 12-2011)

27-CV-16-1982

CASE 0:16-cv-00556-JRT-HB   Document 1-1   Filed 03/03/16   Page 29 of 43   Filed in Fourth Judicial District Court
2/12/2016 4:01:47 PM
Hennepin County, MN

 **CICI Utility – CICI Assignment Successful**
no-reply  to:  REDACTED                              07/30/2013 08:48 AM

Thank you for registering your entity record with the CICI Utility Portal. You have successfully registered the following record(s):

- 549300BJKGMHVWKZWS60

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to which they are addressed. If you have received this email in error, please notify us immediately and delete the email and any attachments from your system. The recipient should check this email and any attachments for the presence of viruses. The company accepts no liability for any damage caused by any virus transmitted by this email.

CICI Portal                                                                          Page 1 of 1

Business Entity Data B.V.

### Invoice

| | |
|---|---|
| Order Number | 102937519204942139 |
| Card Holder Name | REDACTED |
| Credit Card Number | XXXXXXXXXXXX1007 |
| Order Confirmation Date | 2013-07-30 13:48:13.207 |

**Provider Information**
Business Entity Data B.V.
Barchardplein 200
Amsterdam
Netherlands
1007 JB
VAT: 851852866901
Dutch Chamber Of Commerce (KvK): 56021944

### Billing Information

| | |
|---|---|
| Company Name | Upsher - Smith Laboratories |
| First/Last Name | REDACTED |
| Street Address Line 1 | 6701 Evenstad Drive |
| Street Address Line 2 | |
| Country | UNITED STATES |
| State/Province | MN |
| City | Maple Grove |
| Post Code | 55369 |
| VAT Number | |

| Item Type | Legal Name | Country | Price |
|---|---|---|---|
| Self-Registration | Upsher-Smith Laboratories, Inc. | UNITED STATES | 200.00 USD |

| | |
|---|---|
| Sub-Total | 200.00 USD |
| Total | 200.00 USD |

Filed in Fourth Judicial District Court
2/12/2016 4:01:47 PM
Hennepin County, MN



**FIFTH THIRD BANK**

# Fifth Third Bank
# Swap Counterparty and Guarantor Questionnaire

The Dodd-Frank Act imposes new regulatory requirements on parties that enter into swap transactions. The term "swap" is defined broadly to include most off-exchange derivatives transactions, including options, caps, collars, and certain forwards. As a result, Fifth Third Bank ("Fifth Third," "we," "us," or "our") is required to collect and maintain certain information from you to ensure that we are able to enter into swap transactions with you.

<u>Instructions:</u> If more than one person or entity will be acting jointly in entering into or guaranteeing a swap with us, please complete a separate Questionnaire for each such person or entity as a separate Counterparty or Guarantor. However, if affiliated entities (e.g., parent company and subsidiaries) will enter into a swap jointly as co-counterparties or guarantors, and if the answers to this Questionnaire are the same for each such entity, then only one such entity (e.g., the parent company) needs to complete the entire Questionnaire, provided that an authorized signer completes and signs the Addendum at the end of this Questionnaire on behalf of the other affiliated entities. Please be thorough as incomplete answers may delay our ability to transact.

This Questionnaire contains six separate parts: (1) General Information, (2) ECP Status of Counterparty, (3) Eligible Guarantor Status, (4) Financial Entity Status, (5) Special Entity Status, and (6) Addendum for Affiliated Counterparties. Individual persons should complete Part 1 and either Part 2 (if a swap counterparty) or Part 3 (if a guarantor). Entities should complete all parts of this Questionnaire that apply to them. Everyone should complete and sign the Acknowledgment and Signature section on page 3.

## PART 1 – GENERAL INFORMATION

1. Counterparty's or Guarantor's legal name (in the case of a legal entity, please use the name as it appears in its organizational documents as registered in its jurisdiction of organization):

_____

2. Counterparty's or Guarantor's principal address (no P.O. Box)

Address for notices (if different)

_____    _____

_____    _____

_____    _____

Attn: _____    Attn: _____

Phone: _____    Phone: _____

Fax: _____    Fax: _____

Email: _____    Email: _____

3. Counterparty's or Guarantor's principal occupation or business: (describe)

_____

_____

**4. Customer Designation** (Check all that apply)

☐ Bank ☐ Commodity Pool ☐ Corporation ☐ Endowment
☐ ERISA ☐ Individual ☐ Insurance Company ☐ LLC
☐ LLP ☐ Mutual Fund ☐ Partnership ☐ State or Municipal Pension Plan
☐ Trust ☐ Other: _____

**5. U.S. Person Status**

Please indicate whether any of the following statements are true. You may check more than one box if each corresponding statement is true.

☐ Counterparty or Guarantor is a resident of the United States.

☐ Counterparty or Guarantor is a corporation, partnership or other legal entity organized or incorporated under the laws of the United States.

☐ Counterparty or Guarantor is a corporation, partnership or other legal entity in which one or more of the direct or indirect owners thereof that are responsible for the liabilities of such entity are U.S. Persons.

☐ Counterparty or Guarantor is an estate or trust subject to U.S. income tax.

☐ Counterparty or Guarantor is a commodity pool, pooled account or collective investment vehicle (whether or not it is organized or incorporated in the U.S.) where: (i) majority ownership is held, directly or indirectly, by "U.S. Person(s)"; or (ii) the operator of which is required to register as a Commodity Pool Operator under the CEA.

☐ Counterparty or Guarantor is a pension plan for employees, officers or principals of a legal entity with its principal place of business inside the United States.

☐ Counterparty or Guarantor is an individual account where a beneficial owner meets any of the above criteria.

**6. Third Party Control Person Information** (if applicable)

*(If Counterparty does not have a Control Person, please skip this section. If Counterparty has more than one Control Person, please include information about other Control Persons on a separate sheet.)*

Will any person or entity other than an officer or employee of Counterparty (e.g. an agent, investment manager, broker, etc.) be exercising any control with respect to Counterparty's swaps with Fifth Third (a "Control Person")?

☐ Yes   ☐ No   If "Yes", please provide the name and address of the Control Person.

Control Person's name: _____

**Control Person's address**                  **Address for notices** (if different)

_____                      _____

_____                      _____

_____                      _____

Attn: _____                         Attn: _____

Phone: _____                        Phone: _____
Fax: _____                          Fax: _____
Email: _____                        Email: _____

2

## 7. Acknowledgement & Signature

Counterparty or Guarantor acknowledges that we will be relying on his or its completed Questionnaire to determine if we may legally transact with Counterparty or Guarantor in swaps (including our legal compliance requirements) and agrees promptly to notify us in writing of any changes regarding the information or responses provided (and, in any case, before entering into any swap following such change).

On behalf of Counterparty or Guarantor, the undersigned represents to Fifth Third that the information and responses provided in this Questionnaire are true and accurate.

**Name of Counterparty or Guarantor**

**Signature of authorized signer**

**Name of authorized signer (print/type)**

Title: _____

Date: _____

## Important Information & Disclaimer – Counterparty's or Guarantor's Status & Eligibility

Nothing in this Questionnaire or any attachment is intended to be legal advice. Parties with questions regarding their status, eligibility or whether they meet or satisfy definitional, eligibility or other legal requirements should consult with their attorneys. In some cases, such matters may require interpretation of the commodity, securities or banking laws, rules, regulations or guidance provide by the CFTC, SEC or banking regulators or how they apply in specific circumstances. Even if a party or its attorneys conclude that it will meet or satisfy definitional, eligibility or other legal requirements, we reserve the right not to offer swaps to parties if we have reservations regarding any of these matters. Also, our entry into any swap should not be construed as expressing our opinion or view as to whether a party or its activities meets or satisfies definitional, eligibility or other legal requirements.

Please note that, regardless of information provided to us in this Questionnaire or otherwise from time to time, or that may be or come into our possession, we rely on written representations from our counterparties and guarantors regarding their status, eligibility or other qualifications when they transact swaps with us. Also, a party's status, eligibility or other qualifications to transact in certain derivatives, foreign exchange, securities, commodities or other financial or physical products may depend on other criteria or requirements in addition to, or separate from, those described in this Questionnaire, and it remains the responsibility of our counterparties and guarantors to be familiar with and satisfy any and all legal requirements before they transact with us.

3

## PART 2 – ECP STATUS OF COUNTERPARTY

New Section 2(e) of the Commodity Exchange Act ("CEA") requires each party to be an "eligible contract participant" ("ECP") when it enters into any swap.

**Instructions:** This Part 2 of the Questionnaire is divided into three sections for: (a) individual persons, (b) corporations and other entities, and (c) regulated entities.

To determine whether you qualify as an ECP under the CEA, please review the applicable section below and check the appropriate box or boxes. In checking a category below, you certify and represent that you have: read the definition of an ECP in § 1a(18) of the CEA, as amended, and CFTC Rule 1.3(m), as amended; and that you qualify as an ECP with respect to such category or categories. Check all categories that apply.

**2.A. Individual persons.** Parties who are individuals may qualify as an ECP under the CEA if they meet the requirements described in any of the categories listed below.

☐ Counterparty is an individual who has **amounts invested on a discretionary basis** the aggregate of which is in excess of $10 million.

☐ Counterparty is an individual who has **amounts invested on a discretionary basis** the aggregate of which is in excess of $5 million **and** is entering into the swap in order to **manage the risk** associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the Counterparty.

☐ Counterparty is an individual who operates a business as a proprietorship (i.e., he or she (i) has an active role in operating the business, (ii) directly owns all of the assets of such business, and (iii) is directly responsible for all liabilities of such business) **and** Counterparty satisfies at least one of the categories listed below in Part 2.B.

**2.B. Corporations and other entities.** Parties that are a corporation, partnership, proprietorship, organization, trust, or other entity (*excluding a governmental entity, a commodity pool and any other regulated entity described below in Part 2.C.*) may qualify as an ECP if they meet the requirements in any of the categories listed below.

☐ Counterparty has a **net worth** exceeding $1 million, **and** is entering into the swap in connection with the conduct of the entity's business or to **manage the risk** associated with an asset or liability owned or incurred or reasonably likely to be owned or incurred by the Counterparty in the conduct of its business.

**Optional:** If you wish to explain the basis used to determine Counterparty's assets or net worth (e.g., book value, appraised value, fair market value, etc.), you may do so in the space below:

☐ Counterparty has **total assets** exceeding $10 million.

☐ Counterparty's obligations under the Swap are **guaranteed or otherwise supported by a** corporation, partnership, proprietorship, organization, trust, other entity, or an individual deemed to be an "indirect proprietorship," provided that the guarantor qualifies as an **eligible guarantor**. (Please list the eligible guarantor that is providing credit support for Counterparty's swap obligations, and either (i) complete a separate Questionnaire for such guarantor or (ii) if the guarantor is an affiliate of Counterparty, complete Part 3 of this Questionnaire plus the Addendum on page 10.)

Name of Guarantor: _____

☐ All of the owners of the Counterparty are themselves ECPS, **and** the purpose of the swap is to hedge or mitigate a commercial risk of Counterparty.

4

**2.C.** **Regulated entities**. Parties that are a regulated entity may qualify as an ECP if they meet the requirements in any of the categories listed below.

☐ A "financial institution" as defined in §1a(21) of the CEA.

☐ An insurance company that is regulated by a State, or that is regulated by a foreign government and is subject to comparable regulation as determined by the CFTC, including a regulated subsidiary or affiliate of such insurance company.

☐ An investment company subject to regulation under the Investment Company Act of 1940, or a foreign person performing a similar role or function subject as such to foreign regulation (regardless of whether each of its investors is an ECP).

☐ A "commodity pool" as defined in CEA §1a(10) that (1) has total assets exceeding $5 million and (2) was formed and is operated by a person subject to regulation under the CEA or a foreign person performing a similar role or function subject as such to foreign regulation, except for purposes of CEA §§2(c)(2)(B)(vi) and 2(c)(2)(C)(vii), excluding any commodity pool in which any participant is not an ECP.

☐ A broker or dealer subject to regulation under the Securities Exchange Act of 1934 ("1934 Act"), or a foreign person performing a similar role or function subject as such to foreign regulation, excluding in either case any natural person or proprietorship that is not a ECP under clause (v) or (xi) of CEA §1a(18).

☐ An associated person of a registered broker or dealer concerning the financial or securities activities of which the registered broker or dealer makes and keeps records under §15C(b) or 17(h) of the 1934 Act.

☐ An investment bank holding company (as defined in § 17q(f) of the 1934 Act).

☐ A futures commission merchant subject to regulation under the CEA or a foreign person performing a similar role or function subject as such to foreign regulation, excluding in either case any natural person or proprietorship that is not a ECP under clause (v) or (xi) of CEA §1a(18).

☐ A floor broker or floor trader subject to regulation under the CEA in connection with any transaction that takes place on or through the facilities of a registered entity (other than an electronic trading facility with respect to a significant price discovery contract) or an exempt board of trade, or any affiliate thereof, on which such person regularly trades.

☐ An investment adviser subject to regulation under the Investment Advisers Act of 1940, a commodity trading advisor subject to regulation under the CEA, or a foreign person performing a similar role or function subject as such to foreign regulation, in any such case acting as an investment manager or fiduciary for an ECP (excluding a person acting as a broker or performing an equivalent agency function) and who is authorized by such ECP to commit such ECP to the transaction.

☐ A "swap dealer" as defined in CEA §1a(49) and CFTC Rule 1.3(ggg) or a "security-based swap dealer" as defined in §3(a)(71) of the 1934 Act and SEC Rule 3a71-1.

☐ A "major swap participant" as defined in CEA §1a(33) and CFTC Rule 1.3(hhh) or a "major security-based swap participant," as defined in §3(a)(67) of the 1934 Act and SEC Rule 3a67-1.

---

This list is based on the definition of "eligible contract participant" under CEA §1a(18) and is not an exact copy of the language. We have excluded from this list certain types of entities that may qualify as ECPs, assuming certain requirements are met, including any "special entity" described in Part 4 of this Questionnaire. For example, we have excluded employee benefit plans, endowments and federal, state and local governments.

---

5

## PART 3 – ELIGIBLE GUARANTOR STATUS

**Name of Guarantor:** _____

**Instructions:**  The CFTC has interpreted Section 2(e) of the Commodity Exchange Act to require that each guarantor of a swap must be an ECP or an eligible guarantor under an applicable CFTC no-action position.   If more than one person or entity will be guarantors in a swap with us, please complete a separate Questionnaire for each such person or entity, unless they are affiliated entities, in which case one Questionnaire plus the Addendum on page 10 should be completed.

This Part 3 of the Questionnaire is divided into two sections for:  (a) individual persons and (b) corporations and other entities.  To determine whether a Guarantor qualifies as an eligible guarantor, please review the applicable section below and check the appropriate box or boxes.  Check all categories that apply.

**3.A. Individual persons .**  Individuals may qualify as an eligible guarantor if they meet all of the requirements described below in sections 3.A.1 – 3.A.4.

1. ☐  Guarantor is deemed to be an "indirect proprietorship," which means that he or she operates its business through a legal entity such as a corporation or LLC.

2. ☐  Guarantor has either (i) a net worth exceeding $1 million or (ii) amounts invested on a discretionary basis in excess of $5 million.

3. ☐  Guarantor is an owner of the swap counterparty whose swap obligations are being guaranteed ("Guaranteed Swap Counterparty") and plays an active role in operating the business of the Guaranteed Swap Counterparty.

4. ☐  The Guaranteed Swap Counterparty enters into the swaps solely to manage the floating interest rate risk associated with a loan received, or reasonably likely to be received, by the Guaranteed Swap Counterparty in the conduct of its business.

**3.B. Corporations and other entities.**  Parties that are a corporation, partnership, proprietorship, organization, trust, or other entity may qualify as an eligible guarantor if they meet the requirements in sections 3.B.1, 3.B.2, or 3.B.3 listed below.

1. ☐  Guarantor has **total assets** exceeding $10 million.

2. ☐  Guarantor meets all of the requirements described below in B.2.a – B.2.c.

     a. ☐  Guarantor has a net worth exceeding $1 million.

     b. ☐  Guarantor is an owner of the Guaranteed Swap Counterparty and plays an active role in operating the business of the Guaranteed Swap Counterparty.

     c. ☐  The Guaranteed Swap Counterparty enters into the swaps solely to manage the floating interest rate risk associated with a loan received, or reasonably likely to be received, by the Guaranteed Swap Counterparty in the conduct of its business.

3. ☐  The swap obligations being guaranteed by Guarantor are also supported by an eligible guarantor under sections 3.A, 3.B.1, or 3.B.2 above, and, in the case of an eligible guarantor under sections 3.A or 3.B.2, the eligible guarantor is an owner of Guarantor and plays an active role in operating Guarantor's business.

6

## PART 4 – FINANCIAL ENTITY STATUS

The Dodd-Frank Act requires the clearing of all swaps that the CFTC has determined should be cleared. However, the Dodd-Frank Act provides an exception (known as the end-user exception) from the clearing requirement that applies to any swap counterparty that (1) is not a "financial entity," (2) is using the swap to hedge or mitigate commercial risk and (3) notifies the CFTC how it meets its financial obligations associated with uncleared derivatives. This exception is at the option of the end user; the exception does not apply if the end user elects to have the swap cleared.

Set forth below is the definition of the term "financial entity" from the CEA and a List of Financial Entity Categories. After reviewing the definition and list, please answer the following question:

Is Counterparty engaged in any business of a type that falls under any of the entity types or activities described in the definition of "financial entity" or listed on the List of Financial Entity Categories?

☐ Yes        ☐ No

If you answered "Yes", please check each box in the List of Financial Entity Categories that describes Counterparty and/or its business(es)/activities.

Please note that engaging in a particular business or activity listed below does not necessarily mean a person or entity is a financial entity. In many cases, this classification may depend on whether a person or entity is predominantly engaged in such business or activity relative to its other businesses or activities. In addition, the CFTC has adopted rules that exempt certain financial institutions from the definition of "special entity," provided that they have total assets of $10 billion or less.

### Definition of "Financial Entity"

Under §2(h)(7)(C)(i) of the Commodity Exchange Act, a "financial entity" is—

> "(I) a swap dealer; (II) a security-based swap dealer; (III) a major swap participant; (IV) a major security-based swap participant; (V) a commodity pool; (VI) a private fund as defined in section 202(a) of the Investment Advisers Act of 1940 (15 U.S.C. 80-b-2(a)); (VII) an employee benefit plan as defined in paragraphs (3) and (32) of section 3 of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1002); (VIII) a person predominantly engaged in activities that are in the business of banking, or in activities that are financial in nature, as defined in section 4(k) of the Bank Holding Company Act of 1956."

### List of Financial Entity Categories

#### A. Registered Entities

☐ Swap Dealers
☐ Security-based Swap Dealers
☐ Major Swap Participant
☐ Major Security-based Swap Participant

#### B. Funds & Vehicles

☐ Commodity pool
☐ Collective investment fund
☐ Hedge fund or private equity fund
☐ Securitization vehicles

#### C. Benefit Plans

☐ Employee benefit plans (foreign or domestic, including governmental and church plans), whether or not subject to ERISA regulation

7

## D. Entities Engaged in Financial Activities

**Banking**
- ☐ Banks, savings and loan associations, nonbank depository institutions, and their holding companies
- ☐ Trust companies, fiduciaries, and custodians

**Insurance**
- ☐ Insurance companies, and their holding companies
- ☐ Sureties and guarantors
- ☐ Insurance agency and brokers

**Financing**
- ☐ Finance companies
- ☐ Financing subsidiaries of non-finance companies
- ☐ Factoring companies
- ☐ Sales finance companies
- ☐ Lease financing companies

**Advisory & Fund Sponsor**
- ☐ Investment advisers (registered or unregistered)
- ☐ Financial advisers
- ☐ Mutual fund administrators, managers and sponsors
- ☐ Commodity trading advisors
- ☐ Commodity pool operators
- ☐ Asset manager

**Principals & Brokers**
- ☐ De minimis or unregistered swap dealer or security-based swap dealer
- ☐ Broker-dealers (registered or unregistered)
- ☐ Futures commission merchants (registered or unregistered)
- ☐ Government securities dealers (registered or unregistered)
- ☐ Municipal securities dealers (registered or unregistered)
- ☐ Loan brokers
- ☐ Arrangers (of financing)
- ☐ Finders

**Funds & REITS**
- ☐ Mutual funds
- ☐ Investment companies (whether or not registered under the Investment Company Act of 1940)
- ☐ Trading companies (in financial assets)
- ☐ Bank collective investment fund
- ☐ REITs

**Other Financial Services**
- ☐ Loan and deposit processing and loan servicing companies
- ☐ Credit card and merchant processors
- ☐ Check cashers
- ☐ Issuers and sellers of money orders and other payment instruments

---

Fifth Third uses this Questionnaire and your responses solely for its own regulatory compliance purposes and makes no representation or warranty that this list is complete or that each entity or activity type listed above falls under the definition of "financial entity" under the CEA. Whether a person is a "financial entity" under the CEA is a technical legal question. Therefore, you should not rely on this Questionnaire to make any such determination of your status regardless of your responses to the Questionnaire. Instead, you should consult your attorneys on this question, including what legal restrictions and requirements will apply to your swap activities.

8

## PART 5 – SPECIAL ENTITY STATUS

The Dodd-Frank Act defines the term "special entity" to mean (i) a federal, state or local governmental entity or any political subdivision thereof, or any instrumentality, agency, department or corporation of, or established by, any such governmental entity or political subdivision, (ii) a governmental plan, (iii) an employee benefit plan, or (iv) an endowment. Under that definition, is Counterparty or Guarantor a "special entity?"

☐ Yes          ☐ No

If you answered "Yes," please indicate which of the following statements is true by checking the appropriate box.

☐   Counterparty or Guarantor is a Federal agency.

☐   Counterparty or Guarantor is a State, State agency, city, county, municipality, other political subdivision of a State, or any instrumentality, department, or a corporation of or established by a State or political subdivision of a State.

☐   Counterparty or Guarantor is an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974 ("ERISA").

☐   Counterparty or Guarantor is a governmental plan, as defined in Section 3 of ERISA.

☐   Counterparty or Guarantor is an endowment, including an endowment that is an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986.

☐   Counterparty or Guarantor is none of the above but is an employee benefit plan defined in Section 3 of ERISA.

9

## PART 6 - ADDENDUM FOR AFFILIATED COUNTERPARTIES OR GUARANTORS

If affiliated entities (*e.g.*, parent company and subsidiaries) will enter into a swap jointly as co-counterparties, or as counterparty and guarantor, and if the answers to this Questionnaire are the same for each such entity, then an authorized signer for such entities can complete and sign this Addendum instead of having each entity complete a separate Questionnaire. An entire Questionnaire must be completed and signed for at least one of the affiliated entities (*e.g.*, the parent company).

Name of Counterparty or Guarantor that completed this Questionnaire:

_____

Names of Affiliated Entities for which the answers to the Questionnaire are the same as those for the Counterparty or Guarantor named above:

_____

_____

_____

_____

_____

_____

**Acknowledgment & Signature**

On behalf of the entities listed above, the undersigned represents to Fifth Third that the information and responses provided in this Questionnaire are true and accurate.

_____
**Signature of authorized signer**

_____
**Name of authorized signer** (print/type)

**Title:** _____

**Date:** _____

Please email the completed, signed questionnaire to CapitalMarketsRegulatoryDocumentation@53.com.

CIN\\un\\3443

10

# FIFTH THIRD BANK

## FX CUSTOMER PROFILE

**Legal Name of Counterparty** (please use the name as it appears in its organizational documents as registered in its jurisdiction of organization): Upsher-Smith Laboratories, Inc.

**Principal Address** (please use the address as it appears in its organizational documents as registered in its jurisdiction of organization):

Address (No P.O. Boxes): 6701 Evenstad Drive

City: _____ State: _____ Zip Code: 55369

**Customer Designation:**

- [ ] Bank
- [ ] Commodity Pool
- [X] Corporation
- [ ] Endowment
- [ ] ERISA
- [ ] Individual
- [ ] Insurance Company
- [ ] LLC
- [ ] LLP
- [ ] Mutal Fund
- [ ] Partnership
- [ ] Sate or Municipal Pension Plan
- [ ] Trust
- [ ] Other: _____

**US Tax Identification Number** (if applicable, may not apply for certain foreign entities): _____

## CONTACT INFORMATION FOR CONFIRMATIONS

**Fax# for Confirmations:** _____   **Phone#:** _____

**Mailing Address for Confirmations** (if different from above, used if hard copies need to be mailed):

Address (No P.O. Boxes): _____

City: _____ State: _____ Zip Code: _____

Primary Confirmation Contact: _____   Phone#: _____

Email Address: _____

Secondary Confirmation Contact: _____   Phone#: _____

Email Address: _____

Optional Confirmation Contact: _____   Phone#: _____

Email Address: _____

Optional Confirmation Contact: _____   Phone#: _____

Email Address: _____

If you will be transacting via Internet trading on FXALL or MISYS please advise and provide the related ID:
(please contact your Fifth Third FX Sales Representative to discuss if needed)

MISYS ID: _____   [ ] FX Match MISYS

FXALL ID: _____   [ ] FX Match FXALL

*For Internal Use Only*

## AUTHORIZATION AGREEMENT FOR DIRECT PAYMENT

Company Name:

I/We hereby authorize Fifth Third Bank to initiate debit entries to my/our account indicated below, and at the financial institution named below, hereinafter referred to as DEPOSITORY.

Account Name: Usher-Smith Laboratories, Inc. - Operating Acct

Account Number: **REDACTED**

Account type (please circle one)  (demand deposit)   savings

Receiving Financial Institution Name: Fifth Third Bank

Address: 80 S. 8th Street Ste 900 Minneapolis, MN 55402

Routing and Transit Number **REDACTED**

This authorization will remain in full force and effect until Fifth Third Bank has received written notification from me of my intent to terminate this service in such time and in such manner as to afford Fifth Third Bank and DEPOSITORY to act upon it.

Full Name of Authorized Individual(s): **REDACTED**

_____

Authorized Signature(s): **REDACTED**

Date: 9-3-13

40

*$100K*
*10 Digits Bank ID*

*Done*



**ach filter**
Webb, John    to:    REDACTED                          11/19/2013 11:10 AM

Nan,

Below are our details for setting up your ACH filter.

Company name is : International
Company ID is :    REDACTED

Thank you,


John Webb
Capital Markets
Risk and Control Specialist
Fifth Third Bank
38 Fountain Square
Cincinnati, Ohio 45202
MD.10903C
John.Webb2@53.com
OpsCMinvestigations.Bancorp@53.com
Phone: 513-534-3765
Fax: 513-579-4185


This e-mail transmission contains information that is confidential and may be privileged. It is intended only for the addressee(s) named above. If you receive this e-mail in error, please do not read, copy or disseminate it in any manner. If you are not the intended recipient, any disclosure, copying, distribution or use of the contents of this information is prohibited. Please reply to the message immediately by informing the sender that the message was misdirected. After replying, please erase it from your computer system. Your assistance in correcting this error is appreciated.