# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Upsher -Smith Laboratories, Inc.,

     Plaintiff,

vs.

Fifth Third Bank,

     Defendant.

---

Case No. 0:16-cv-00556-JRT-JSM

**FIRST AMENDED
COMPLAINT**

Plaintiff, Upsher-Smith Laboratories, Inc. ("Upsher-Smith"), as and for its Complaint against Defendant Fifth Third Bank ("Fifth Third"), states and alleges as follows:

## <u>INTRODUCTION</u>

1. On June 17, 2014, Upsher-Smith senior management learned that over a period of less than three weeks an accounts payable employee directed Fifth Third to send foreign currency wire or other third party funds transfers totaling over $50 million from Upsher-Smith's operating account.  Each transfer was sent as part of a fraud scheme in which an individual purporting to be Upsher-Smith's Chief Executive Officer directed the accounts payable employee to follow the directions of a purported attorney, David Madison, and wire transfer large sums of money to foreign bank accounts in China and Slovakia.

2. Between May 29 and June 17, 2014 and based solely on communications with a single Upsher-Smith employee alone, Fifth Third sent nine wire or other third

party funds transfers of Upsher-Smith's funds, totaling $52,509,373.49.  Although Upsher-Smith was able to recall one wire, $39,792,783.53 of the money transferred was never recovered.  The fraud scheme was ultimately successful because Fifth Third acted solely on instructions of one Upsher-Smith employee without the involvement of any Upsher-Smith manager or other employee and failed to obtain separate confirmation of the legitimacy of these wire or other third party funds transfers, as required by both contract and commercially reasonable banking practices under the facts presented.

3.      In sending these wire or third party funds transfers based solely on instructions and confirmation from a single Upsher-Smith employee, Fifth Third breached the contractual protocol governing foreign currency  funds transfers as agreed to by the parties.  Pursuant to its contract with Fifth Third, two Upsher-Smith confirmations (both a "Primary Confirmation" and "Secondary Confirmation") were necessary before Fifth Third was authorized to make the transfers.  Fifth Third only obtained one confirmation for each of the transfers in question.  If the required second confirmation had been obtained by Fifth Third, the fraudulent scheme would have been detected and the loss avoided.  Fifth Third's breach of contract with Upsher-Smith resulted in unrecovered fraudulent transfers totaling more than $39 million.

4.      Not only did Fifth Third breach its contract with Upsher-Smith by executing the foreign currency wire or third party funds transfers, but the transfers were executed despite the existence of multiple "red flags" that should have led reasonable and sophisticated bankers in the position of Fifth Third to question Upsher-Smith senior executives – other than the lone, accounts payable coordinator – about these highly

irregular/unusual transactions.  Such questioning would have revealed and prevented the fraud scheme, thereby preventing the fraudulent funds transfers from being made.  Upon information and belief, Fifth Third – as a regulated bank – operates under strict internal policies and/or protocols providing for approvals at higher levels of bank management for significant wire transfers as executed under the facts of this case, which on information and belief Fifth Third failed to follow in executing the wire/funds transfers at issue.  The policies and/or protocols are designed to protect bank customers like Upsher-Smith, the safety and soundness of Fifth Third for the benefit of all bank customers and the safety and soundness of the banking system in the United States.

5.     As a result of Fifth Third's breaches of its contractual and other legal duties, and otherwise wrongful conduct, Upsher-Smith has suffered direct losses of $39,794,783.53, in addition to expenses, fees, other consequential damages and interest at 10% under Minnesota law.  Upsher-Smith's damages through trial will exceed $50 million.

6.     Fifth Third claims that it did not actually engage in "wire transfers" on behalf of Upsher-Smith, and that its services to Upsher-Smith were limited to foreign exchange or "FX" transactions.  Yet, both Fifth Third's internal policies and the repeated communications between Upsher-Smith and Fifth Third refer to these transactions at issue as "wires" and yet Fifth Third never attempted to clarify with Upsher-Smith that it was not actually conducting wire transfers, as Upsher-Smith believed Fifth Third was doing and as Upsher-Smith hired Fifth Third to conduct.  Moreover, whether or not the transactions can technically be called "wire transfers," the transactions involved transfers

of Upsher-Smith funds through a banking process involving all the elements of a wire

transfer and subject to many or all of the risks associated with wire transfers – risks that

were never properly disclosed or explained to Upsher-Smith and risks that were

recognized by Fifth Third policies but were ignored by Fifth Third in a manner that

allowed the fraud to occur.  Subject to this clarification, references in this First Amended

Complaint to wire transfers are intended to refer to the transactions conducted by Fifth

Third whether or not they meet Fifth Third's definition of "wire transfers."

## PARTIES

7.      Plaintiff Upsher-Smith Laboratories, Inc. is a Minnesota corporation with

its principal place of business located at 6701 Evenstad Drive, Maple Grove, MN 55369.

Upsher-Smith is a privately-held pharmaceutical manufacturing, distribution and sales

company.

8.      Upon information and belief, Defendant Fifth Third Bank is a nationally-

regulated bank incorporated in Ohio with its principal place of business located at 38

Fountain Square Plaza, Cincinnati, Ohio 45263.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over Upsher-Smith's claims

pursuant to 28 U.S.C. § 1332, as the matter in controversy exceeds $75,000, exclusive of

interest and costs, and is between citizens of different states.

10.     This Court has personal jurisdiction over Fifth Third because Fifth Third

has continuously and systematically directed its activities at residents of this State, has

purposefully derived benefit from its business activities in this State, has created a

substantial connection with this State, has deliberately engaged in significant activities within this State, and has created continuing obligations between itself and residents of this State.  Moreover, during the period of time relevant to this action Fifth Third maintained an office in Minneapolis, Minnesota, at which Fifth Third employees doing business with Upsher-Smith worked.  As such, subjecting Fifth Third to the jurisdiction of this Court will not violate traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Upsher-Smith's claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

12.     In June 2012, Upsher-Smith entered into a Credit Agreement with a syndicate of banks.  JPMorgan Chase ("JPMorgan"), Wells Fargo and US Bank were the lead banks on the deal, with Upsher-Smith working primarily with JPMorgan, where it maintained an operating account.  The credit relationship included a "swingline loan," which generally allowed Upsher-Smith to draw on its credit line on a short-term basis for funds needed to conduct company business.

13.     As is typical in credit relationships of this kind, the lead banks allocated some of the financing risks associated with the financing transaction to other banks that became participants in the credit facility.  Fifth Third was one of several banks that became part of the bank group providing credit to Upsher-Smith.  Fifth Third was aware of the swingline feature of the credit relationship.

14.     After Fifth Third became part of the bank group, Upsher-Smith began receiving calls from Neil Brenner ("Brenner"), Fifth Third's Managing Director – Foreign Exchange, seeking additional Upsher-Smith banking business for Fifth Third. Fifth Third had previously opened a foreign exchange office in Minneapolis to serve Minnesota-based companies that were conducting international business.  According to Brenner, who managed Fifth Third's Minneapolis foreign exchange office, opening of the office "illustrates [Fifth Third's] commitment to the Minnesota business community."

15.     Based upon Brenner's solicitations, Upsher-Smith agreed to move its foreign currency wire transfer business to Fifth Third.  In approximately August 2013, Fifth Third became Upsher-Smith's primary foreign currency wire transfer service provider.

16.     Prior to this, Upsher-Smith conducted its wire transfers requiring foreign currency through another financial institution.  Though not extensive in number, Upsher-Smith had the need on occasion to make payments to certain third parties, such as vendors located in foreign countries, in foreign currencies rather than U.S. dollars. Upsher-Smith agreed to begin carrying out these transactions through Fifth Third Bank.

17.     Upsher-Smith and Fifth Third entered into a contractual relationship pursuant to which Fifth Third would send foreign currency wire transfers from funds it would receive from an Upsher-Smith bank account at JPMorgan.  Funds for wire transfers were to be drawn directly from Upsher-Smith's operating account at JPMorgan. If sufficient funds were not available in the account, the funds would be loaned to Upsher-Smith by means of a draw from the swingline.

18.     As part of the contractual relationship, Fifth Third required that Upsher-Smith be "accurately" set up in Fifth Third's foreign exchange ("FX") systems "to satisfy compliance requirements."  Among the "required documentation" needed to set up Upsher-Smith's FX account and to "meet compliance requirements" was a "FX Customer Information Form."  This Form required, among other things, the designation of multiple Upsher-Smith contacts "for confirmations."  These included a "Primary Confirmation Contact," a "Secondary Confirmation Contact," and at least one "Optional Confirmation Contact."  A copy of the FX Customer Information Form is attached hereto as **Exhibit A**.

19.     On or about July 30, 2013, Upsher-Smith sent the completed "FX Customer Information Form" to Fifth Third.  The form submitted by Upsher-Smith designated its Senior Accounts Payable Coordinator ("AP Coordinator") as the "Primary Confirmation Contact," Upsher-Smith's Manager of General Accounting ("GA Manager") as the "Secondary Confirmation Contact," and its Manager of Accounting and Control ("A&C Manager") as the "Optional Confirmation Contact."  Thus, under the contract between Upsher-Smith and Fifth Third, any foreign currency wire transfer was authorized only by Fifth Third confirming the wire transfer in advance with at least two Upsher-Smith Confirmation Contacts.

20.     From the time Fifth Third began providing foreign currency wire transfers for Upsher-Smith in late August 2013 until late May 2014, Fifth Third on average executed approximately six foreign currency wire transfers per month for Upsher-Smith, generally to recipients in Western Europe or Canada.  None of these wire transfers ordered by Upsher-Smith were to banks or recipients in China or Slovakia.

21.     Prior to May 2014, Upsher-Smith's requests to Fifth Third for foreign currency wire transfers generally came in the form of emails from Upsher-Smith's AP Coordinator to Fifth Third, with at least one other Upsher-Smith manager-level employee shown as being copied on the email.  Thus, at least one Upsher-Smith employee besides the AP Coordinator making the request was made directly aware of the request to Fifth Third.

22.     It was the parties' practice that when Fifth Third responded to these email requests for wire/funds transfers or otherwise communicated via email, Fifth Third would likewise send a copy to at least one Upsher-Smith employee besides the AP Coordinator, such that more than one Upsher-Smith employee had involvement with and/or visibility into the transactions.

23.     This agreed upon process for conducting these transactions dramatically changed, as discussed in more detail below, when Fifth Third began causing the transfer of tens of millions of dollars of Upsher-Smith's funds (in the form of Euros) by payment to third parties in China and Slovakia through a high risk process inconsistent with the agreed process that had been in place for approximately nine months.

24.     Whether or not they are defined as wire transfers by Fifth Third, the FX transactions and funds transfers carried out for Upsher-Smith by Fifth Third involved significant risks to a customer like Upsher-Smith.  One of the substantial risks is due to the fact that the transactions involve not only a conversion of currency, but also the transfer of that foreign currency to a third party.  Fifth Third's Policy Manual for FX transactions recognizes that third party payments, or the transfer of funds in settlement of

an FX transaction to the account of an institution or corporation other than that of the counterparty to the transaction (in this case Upsher-Smith), involve significantly increased operational risk that can expose all involved to fraudulent activity.  Thus, Fifth Third recognized in its own internal governing policies the significant risk associated with the type of service it provided Upsher-Smith.  The Fifth Third Manual also referred to transactions of the kind Upsher-Smith conducted as a "wire" and requires that in setting up a trading relationship with a customer, Fifth Third must agree on a procedure and practice for conducting transactions in a manner that is safe and sound.

25.     Several weeks before beginning to conduct foreign currency transactions on behalf of Upsher-Smith, Fifth Third sent to Upsher-Smith a Foreign Exchange Agreement, while at the same time, telling Upsher-Smith that because its transactions were "expected to be Spot-only," the FX agreement "is not required to be returned under any deadline" but may be required in the future.  Attached to the FX Agreement was a document called "Foreign Exchange Risk Disclosures."  According to the Fifth Third FX Policy Manual, this FX Risk Disclosure is to address the risk associated with third party payments of the kind undertaken for Upsher-Smith.  Yet, the document provided to Upsher-Smith, unlike the internal Policy Manual, contained no discussion about the substantial third party risk that Fifth Third recognized applied to the transactions Fifth Third was seeking to perform for Upsher-Smith.

26.     Fifth Third never required the FX Agreement to be signed or entered into, and Upsher-Smith never signed, returned, or entered into the FX Agreement.

27.     Beginning on approximately May 25, 2014, Upsher-Smith's Chief Executive Officer was in Europe for business and personal travel.

28.     On May 29, 2014, Upsher-Smith's AP Coordinator received an email purporting to be from the CEO.  That e-mail indicated that an attorney, David Madison ("Madison"), would contact her.  The e-mail further stated, that "[w]e are currently acquiring a company and so we will be needing your direct attention concerning accounting documents to finalize this acquisition."  The e-mail further stated, "I gave all the power to our Attorney that will be handing this operation," and it directed the AP Coordinator to "execute everything he needs."  Finally, the e-mail directed the AP Coordinator to keep the information contained therein confidential until Upsher-Smith made a public announcement regarding the acquisition.  In fact, but unbeknownst to the AP Coordinator, this email was not actually from the CEO but was instead from a person or persons perpetrating a fraud on Upsher-Smith.

29.     Shortly thereafter, the AP Coordinator responded to the e-mail purporting to be from the CEO and stated that she would do her "best to provide what is asked for." She further indicated that she had "full understanding of [his] request to keep quiet and handle all of Mr. Madison's requests [her]self."

30.     The e-mail purporting to be from Upsher-Smith's CEO was not from his Upsher-Smith email account, but the AP Coordinator assumed that he was using a different e-mail address due to confidentiality concerns.

31.     Shortly after the email, Madison called the AP Coordinator at work and said that he understood that the CEO had reached out to her, that she needed to keep

everything confidential and that she needed to do what the CEO said to do.  Madison told the AP Coordinator that he would need foreign currency wire transfers, that the first would represent three percent of the down payment for an acquisition, and that he would need her to make additional transfers.  Madison further told the AP Coordinator that because of the type of acquisition they were involved with, there would be fees, penalties and job losses if she talked to anyone about the transfers or acquisition.

32.     On May 29, 2014, Madison requested that the AP Coordinator provide him with information about Upsher-Smith's bank accounts and bank balances, and the AP Coordinator emailed account information to Madison.

33.     Madison asked the AP Coordinator about the daily foreign currency wire transfer limit.  The AP Coordinator then asked Upsher-Smith's A&C Manager about the daily limit, and the A&C Manager called Melissa Sullivan ("Sullivan") at Fifth Third to find out.

34.     Before getting an answer from the A&C Manager, the AP Coordinator e-mailed Brenner and Sullivan at Fifth Third on May 29 at 11:04 a.m., asking if she "need[ed] to do a wire in euros sometime today can we make it a same day transaction?"  In a phone conversation with Sullivan, Hopper likewise asked about the process and limits when Upsher-Smith does a "foreign wire."  Such a "same day transaction" would have been inconsistent with the manner in which foreign currency wire transfers had been processed by Fifth Third for Upsher-Smith in the past.  Sullivan replied that 10:00 a.m. is the outside cutoff time for a same day transaction due to the time difference in Europe.

35.     Upon information and belief, Sullivan informed the A&C Manager that the daily limit was $25 million.  The A&C Manager told the AP Coordinator that the limit for foreign wire transfers was $25 million, and the AP Coordinator then relayed this information to Madison.

36.     At 1:12 p.m. on May 29, 2014, Madison provided the AP Coordinator "details for the first (deposit) payment," requesting that she initiate an international wire transfer in the amount of 930,780 Euro (or approximately $1.28 million) to the beneficiary "CBSC INVESTMENT CO. LTD." through "Ping and Bank Co. ltd" in China.  Based on Upsher-Smith's prior foreign currency wire transfers, this was an unusual request.

37.     On May 29, 2014, the AP Coordinator e-mailed Brenner and Sullivan at Fifth Third with this information.  The email, with the subject described as "Fifth Third Bank Today's wire(s)," stated "[w]e need to set this up for next day please.  This can not wait the two day cycle we normally do."  Unlike prior practice with respect to foreign currency wire transfer requests to Fifth Third, the AP Coordinator did not copy her email to anyone else at Upsher-Smith and she stated to Fifth Third that "[t]his is a confidential matter . . . [p]lease if you have any questions to contact me directly."  The AP Coordinator also asked whether it is "possible to have the confirmation emailed to me this one time?  If not, can I receive a phone call prior to faxing it, I need to be ready to grab it."

38.     The content and nature of the AP Coordinator's request to Fifth Third should have triggered heightened concern, senior approvals and the need for assured

12

secondary, senior approval, from Upsher-Smith to Fifth Third for several reasons, including the fact that it differed from the contract, it differed from established practice, it was unusual as to size, timing, recipient, and alleged confidentiality; and it was subject solely to the AP Coordinator's purported authorization when Fifth Third knew two confirmations were required.  The AP Coordinator's conduct raised multiple red flags that would have alerted a reasonable bank employee with responsibility for foreign currency execution and foreign currency wire transfers or third party payments associated with FX transactions that this request should not be approved.  For example, the unusual and rushed nature of the request, the insistence on confidentiality, the request that Fifth Third depart from ordinary procedures by e-mailing the wire confirmation (or, alternatively, the AP Coordinator's insistence that she get a phone call prior to the fax being sent), and the AP Coordinator's failure to follow her established practice of copying another Upsher-Smith employee on the wire transfer request – all coming on the heels of unusual requests about the daily wire transfer limit and the ability to do same day transactions – all placed Fifth Third on notice that this was a suspect, irregular transaction that should not be approved.

39.     Despite these red flags, at 1:58 p.m., Sullivan wrote the AP Coordinator that she "just executed this deal . . . ."  Sullivan further stated that "Gina Stewart will be calling you momentarily to confirm."  The transfer of the $1.28 million went out the next day.

40.     On May 30, 2014, Madison wrote the AP Coordinator an e-mail indicating that they "might need to conclude another deposit today."  After exchanging e-mails,

Madison provided the AP Coordinator with instructions for a second wire transfer. Specifically, Madison wrote to the AP Coordinator "[t]o follow our phone conversation, we will proceed with the outstanding 17% which will conclude the initial deposit." Madison told the AP Coordinator to wire 5,274,420 Euro (approximately $7.29 million) to beneficiary "CBSC INVESTMENT CO. LIMITED" at "Ping and Bank Co ltd" in China.

41.     Subsequently, the AP Coordinator e-mailed Brenner and Sullivan at Fifth Third at 12:54 p.m. in an email with the subject "A wire for the today," indicating that she needed a wire to occur on Monday and that it "can not wait the two day cycle we normally do."  The AP Coordinator reiterated that "[t]his is a confidential matter" and directed Brenner and Sullivan to contact her directly with any questions.

42.     The AP Coordinator's instruction e-mail for this large, "confidential" and unusual wire transfer, without copying any other Upsher-Smith employee, again should have raised concerns at Fifth Third, especially given that it followed just a day after another highly irregular substantial foreign wire transfer request.

43.     Despite this, Fifth Third executed the wire transfer and Brenner responded to the AP Coordinator's e-mail at 1:08 p.m., confirming that the wire had been executed.

44.     On June 2, 2014, Madison sent an e-mail to the AP Coordinator requesting that she provide him with the swift confirmation numbers ("MT103s") for the two wire transfers that were previously executed by Fifth Third.  At 8:42 a.m., the AP Coordinator e-mailed Brenner and Sullivan at Fifth Third requesting the swift confirmation numbers,

which Gina Stewart ("Stewart") at Fifth Third provided to the AP Coordinator, who then forwarded the numbers to Madison.

45.     On June 3, 2014, Madison provided the AP Coordinator information for a third wire transfer and requested a transfer for 7,229,058 Euro (approximately $9.974 million) to beneficiary "Bartolo S.r.o" at "Tatra Banka" in Bratislava.

46.      The AP Coordinator e-mailed Brenner and Sullivan at Fifth Third at 7:08 a.m., providing the transfer information.  The AP Coordinator stated, "One more to do and it will need to be 'same day'" and that this was a "confidential matter."

47.     Again, despite the repeated pattern of red flags, Fifth Third went through with the wire transfer or third party payment in violation of the two confirmation requirements and without added reasonable due diligence in light of these multiple irregular wire transfer requests.  At 7:26 a.m., Brenner responded that Upsher-Smith purchased "7,229,058 Euros, Rate 1.3798, $9,974,645.23 value today 6/3/14.  USD will be taken from JP Morgan account on file."  Fifth Third also sent the AP Coordinator a copy of the MT103, which the AP Coordinator provided to Madison.

48.     After the AP Coordinator provided Madison with the MT103s from earlier on June 3, Madison e-mailed the AP Coordinator at 9:00 a.m., stating that she should receive the order for the next payment soon and wanting to know if they were "still in time for same day value."

49.     Madison then provided the AP Coordinator with the order for the "last transfers."  Specifically, Madison requested 4,653,900 Euro (approximately $6.414 million) to beneficiary "Bartolo S.r.o" through Tatra Banka A.S. in Bratislava and

2,871,082 Euro (approximately $3.957 million) to beneficiary "Sunny Billion Limited"

through "Ping an Bank Co. Ltd." in China.

50.     The AP Coordinator e-mailed this information to Fifth Third at 9:38 a.m.

She stated that these were the "last two transfers" and requested that Stewart help her

"one more time with the MT103 for these two trades . . . ."

51.     Fifth Third then called the AP Coordinator to confirm the wires.  Upon

information and belief, a Fifth Third representative expressed suspicion about these

transfer requests.  The AP Coordinator wrote to Madison, "[o]h boy the bank just called

and they are curious.  No questions were asked but ensured me they are on it ASAP."

Despite its expressed suspicion, Fifth Third nonetheless executed the wire transfers or

third party payments and failed to bring any concerns to anyone at Upsher-Smith except

the AP Coordinator, despite the fact that by contract and under reasonable commercial

practice Fifth Third was required to seek an additional confirmation beyond the AP

Coordinator for wire transfers.

52.     Fifth Third repeatedly ignored indicia of commercially irregular and/or

fraudulent activity in approving and executing these wire transfers, both independently

and in the aggregate as a pattern over a short time period.

53.     At 9:52 a.m. on June 3, 2014, Brenner e-mailed the AP Coordinator stating

that Upsher-Smith purchased "4,653,900 Euros.  Rate 1.3783.  $6,414,470.37, value

today" and "2,871,082 Euros.  Rate 1.3783.  $3,957,212.32, value today."  Brenner said

the Fifth Third Bank office would call to confirm shortly.

54.     Less than one hour later, at 10:38 a.m. on June 3, 2014, the AP Coordinator emailed Brenner indicating frustration that "[t]his one is taking longer than the ones before" and "I'm under the gun as far as timing."  Brenner immediately directed Stewart to confirm the trades "asap."  She did so; Fifth Third then provided the MT103s for these two payments at 10:54 a.m. on June 3, 2014

55.     On June 4, 2015, Madison sent the AP Coordinator an e-mail requesting confirmation that needed to be tracked for the initial May 29 wire transfer of $1.28 million.  At 8:26 a.m., the AP Coordinator sent an e-mail to Brenner attaching "a confirmation that needs to be tracked" for the May 29 wire transfer.  Brenner responded by stating that the "[f]unds were credited under Deutsche Bank's reference number 03MT140530103163."

56.     On June 5, 2014, Madison wrote to the AP Coordinator stating that he needed the reference information for the third and fourth wire transfers.   The AP Coordinator then e-mailed Brenner at Fifth Third at 7:35 a.m., stating that she needed "the reference number [he] supplied [her] yesterday" for the third and fourth wire transfers.  At 8:44 a.m., Brenner provided the reference numbers to the AP Coordinator, who forwarded the information to Madison.

57.     On June 9, 2014, Madison e-mailed the AP Coordinator to tell her that a beneficiary had not received a deposit yet and to check with Fifth Third.  Madison said that he believed "the funds haven't reached the beneficiaries due to the fact of the intermediary account."  Madison also told the AP Coordinator that there would be two more payments that need to be made.  One transfer was for 528,700 Euro (or

approximately $726,063) to beneficiary "Bartolo S.r.o" through Tatra Banka in Bratislava.  The other transfer for 4,229,058 Euro (or approximately $5.807 million) to the beneficiary "Chunlei Co. Limited" through Bank of Communications Co., Ltd. in China.

58.     In response to Madison's request, the AP Coordinator e-mailed Brenner and Sullivan at Fifth Third requesting information about payments that the beneficiaries had not received.  She also sent them details for the sixth and seventh wire transfers.

59.     Despite the above-mentioned indicia of fraud and the suspicions that should have been raised as a result of the number and amounts of wire transfers being sent to multiple beneficiaries through multiple intermediary banks, and despite the AP Coordinator's previous identification of the prior requests as the "last two transfers," Fifth Third complied with the AP Coordinator's requests.  Sullivan responded at 7:42 a.m. on June 9, 2014 that Upsher-Smith had purchased "4,229,058 Euros.  Rate 1.3733, $5,807,765.35 for value Monday 6/9/14" and "528,700 Euros.  Rate 1.3733, $726,063.71 for value Monday 6/9/14."  Then, at 9:52 a.m., Sullivan e-mailed the AP Coordinator the details for the first five wire transfers, including the corresponding reference numbers and intermediary bank information.

60.     On June 11 at 10:58 a.m., the AP Coordinator e-mailed Fifth Third and asked it to "clear the last 2 payments that we did on Monday."  At 12:13 p.m., Fifth Third responded that "[i]t appears that the funds were indeed received and applied to the correct account per the below.  Ping An Bank will not be granting debit authority to return the

funds given that they were received and applied as instructed." The AP Coordinator then forwarded this e-mail to Madison.

61.     During the morning of June 16, 2014, Madison contacted the AP Coordinator to request that she have the bank send an additional wire transfer. At 8:29 a.m., the AP Coordinator e-mailed Brenner and Sullivan at Fifth Third stating that there is another payment that needs to be made. Specifically, the AP Coordinator requested a transfer to the "Bank of Communications Ltd" for beneficiary "Hongxuan Development Co. Limited" for 3,157,600 Euro.

62.     Fifth Third again ignored the numerous indicia of commercial irregularity, fraud and the requirements of the contract and executed the wire transfer. At 8:50 a.m., Sullivan responded that "[t]he below is all set @1.3736, USD $4,337,279.36." The AP Coordinator then forwarded that e-mail to Madison.

63.     In response, Madison stated, "we just got the confirmation that we have to buy the parts of another bail out investor." He then provided the details for a ninth wire transfer. Specifically, Madison requested a transfer to "Agricultural Bank of China" for beneficiary "Qingtian Ye Suping Foreign Trade Service Co ltd" for 9,264,600 Euro ($12,716,589.96).

64.     At 11:13 a.m. on June 16, 2014, the AP Coordinator sent this information to Fifth Third stating "[s]orry one more . . . valued today[.]" Sullivan responded, "I have confirmed that we cannot do today's value for the below payment (10:00 is the latest we can process for same day). Would you like me to proceed and value for tomorrow 6/17?" The AP Coordinator replied at 12:13 p.m. that the bank should proceed with a value date

of June 17.  Sullivan responded, "[y]ou got it" and stated, "Upsher Smith buys EUR 9,264,600 @1.3726, USD $12,716,589.95 for value 6/17/14."

65.     The AP Coordinator informed Madison that Fifth Third wanted "an intermediary bank to send this through" given the high dollar amount.  Madison responded that the intermediary bank would be Deutsche Bank AG in Germany, and the AP Coordinator sent that information to Fifth Third.  Stewart at Fifth Third responded that Fifth Third would process it shortly.

66.     On June 17, 2014, the AP Coordinator e-mailed Stewart at Fifth Third requesting information relating to the eighth wire.  Stewart responded at 7:50 a.m. with the MT103 for the eighth wire transfer.

67.     Also on June 17, 2014, Upsher-Smith initially discovered that it had apparently been the subject of a fraud.  Upsher-Smith management learned of the initial May 29 email to the AP Coordinator that purported to be from the CEO and soon discovered that the CEO did not send that email.  The AP Coordinator then disclosed to Upsher-Smith senior management the extent of the wire transfers executed by Fifth Third at her request.

68.     All wire transfers sent from Upsher-Smith as part of the fraud scheme were requested by the AP Coordinator based on a mistaken belief that she was acting at the direction of the CEO, directly and/or through the attorney identified as Madison.

69.     The AP Coordinator alone ordered the wire transfers.  She also hid evidence of her actions from other Upsher-Smith employees.

70.     Upon discovering the AP Coordinator's actions and the extent of the fraud, Upsher-Smith's Chief Financial Officer contacted Fifth Third to tell it to suspend all wires and not conduct any further transactions.

71.     At 11:54 a.m. on June 17, 2014, Sullivan at Fifth Third sent an e-mail to others within Fifth Third with the subject line "URGENT RECALL REQUEST."  The e-mail stated "[p]lease urgently recall deal 2014061600424 for Upsher Smith in the amount of EUR 9,264,600."

72.     The fraudulent wire transfers or other third party payments executed by Fifth Third solely upon the AP Coordinator's instruction and without secondary or further independent authorization are as follows (and shall hereafter collectively be referred to as the "Transfers"):

| Contract Date | Value Date | Deposit Bank | Beneficiary | Value (USD) |
|---|---|---|---|---|
| May 29, 2014 | May 30, 2014 | Ping an Bank Co. Ltd. | CBSC Investment | $ 1,285,034.87 |
| May 30, 2014 | June 2, 2014 | Ping an Bank Co. Ltd. | CBSC Investment | 7,290,303.32 |
| June 3, 2014 | June 3, 2014 | Tatra Banka A.S. | Bartolo s.r.o. | 9,974,654.23 |
| June 3, 2014 | June 3, 2014 | Tatra Banka A.S. | Bartolo s.r.o. | 6,414,470.37 |
| June 3, 2014 | June 3, 2014 | Ping an Bank Co. Ltd. | Sunny Billion Limited | 3,957,212.32 |
| June 9, 2014 | June 9, 2014 | Tatra Banka A.S. | Bartolo s.r.o. | 726,063.71 |
| June 9, 2014 | June 9, 2014 | Bank of Communications Co. LTD | Chunlei Co. Limited | 5,807,765.35 |

| June 16, 2014 | June 16, 2014 | Bank of Communications Co. LTD | Hongxuan Development Co. Limited | 4,337,279.36 |
|---|---|---|---|---|
| June 16, 2014 | June 17, 2014 | Agricultural Bank of China | Qingtian YE Suping Foreign Trade Service Co. LTD | 12,716,589.97 |

73.     Ultimately, Upsher-Smith was able to recover the final $12,746,589.97 Transfer, but it was unable to recover any of the other wire Transfers executed by Fifth Third.

74.     Upsher-Smith's direct losses as a result of the fraud scheme totaled $39,792,783.53.   With interest and other consequential losses, its damages through trial will exceed $50 million.

75.     Fifth Third executed every wire transaction or other third party transfer initiated by the AP Coordinator despite the existence of numerous indicia of fraud, including without limitation:  (1) the rushed nature of the AP Coordinator's requests; (2) the AP Coordinator's insistence on confidentiality; (3) the AP Coordinator's request that Fifth Third depart from ordinary procedures by e-mailing the AP Coordinator wire confirmations (or, alternatively, insisting that the AP Coordinator get a telephone call prior to facsimile confirmation being sent so that the AP Coordinator could intercept the confirmation); (4) the AP Coordinator's failure to follow the established practice of copying another Upsher-Smith employee on the Transfer requests; (5) the amounts and frequency of the Transfers (which should have been particularly alarming in light of the comparatively small and infrequent number of foreign wire transfers prior to May 2014);

(6) the numerous intermediary banks for the Transfers; and (7) the suspicious beneficiaries of the Transfers.

76.    Fifth Third executed all of the Transfers upon the AP Coordinator's confirmation alone despite the fact that the contractual relationship, as documented in the FX Customer Information Form, specifically required that Fifth Third obtain confirmation from both a Primary and a Secondary Confirmation Contact.

77.    Fifth Third also hindered Upsher-Smith's ability to perform its obligations under the contract by failing to allow a secondary Upsher-Smith employee to approve the Transfers.

78.    Fifth Third was obligated under the contract to obtain a secondary confirmation from Upsher-Smith.  It was the clear intent of the agreement that someone with more authority within the organization than the AP Coordinator should be contacted with regard to each wire transfer.  Fifth Third had the discretion to either obtain that approval from the individuals identified as contacts in the contract or to do more than was required by going directly to an officer of Upsher-Smith, such as its Chief Executive Officer or Chief Financial Officer, to seek approval for the Transfers.  Given the significant red flags that were present in this action, Fifth Third should have obtained officer-level approval for the Transfers.  Its failure to do so was an unreasonable exercise of its discretion under the contract.

79.    Fifth Third's own internal policy recognized the risk associated with the Upsher-Smith transactions and required that they be conducted in a manner that is safe and sound to protect against those risks.  Upon information and belief, as a regulated

financial institution, Fifth Third had, or should have had, internal policies and/or regularly required approvals at higher levels of bank management for wire or other transfers that are of a sufficient frequency or size, or which meet other criteria creating a higher level of risk, in the event that the wire transfers are fraudulent, unauthorized or otherwise improper.  Upon information and belief, these internal policies, as regularly required, should have caused Fifth Third to inquire of Upsher-Smith in a manner and at an appropriate level of management that would have resulted in detection of the fraudulent and/or unauthorized nature of the wire transfers at issue in this case, and would have prevented the fraudulent wire transfers and the resulting damages to Upsher-Smith.

80.     Fifth Third's violation of its agreed transaction process with Upsher-Smith and its internal policies, and the unreasonableness of its security protocol for its transactions with Upsher-Smith, were motivated, at least in large part, by the large sums Fifth Third made in profits on the transactions.  The "spreads" charged by Fifth Third Bank far exceeded what would be reasonable and customary in transactions of this kind and, based upon information and belief, more than it charged most other similarly situated customers.  Moreover, Fifth Third employees involved in the Upsher-Smith transactions saw them as a way to boost earnings for their group within Fifth Third and potentially as a way to increase their own personal compensation under the Fifth Third compensation plan.

81.     Fifth Third knew that it could take advantage of Upsher-Smith because of the lack of sophistication of the personnel it was dealing with and because of the very red

flags they ignored to allow the fraud to occur.  For example, in an internal phone call with Fifth Third, Brenner communicated to one of his colleagues words to the effect that this Upsher-Smith employee was not knowledgeable or sophisticated.  In another phone call in which Fifth Third was deciding the amount of the spread to charge Upsher-Smith, Brenner and Sullivan concluded that they could charge high spreads because the AP Coordinator was so concerned about confidentiality and timeliness, and that she was not worried about other issues such as Fifth Third's spreads.

## COUNT I
### (Breach of Contract)

82.     Upsher-Smith restates and incorporates by reference each and every paragraph of this Complaint as if fully set forth herein.

83.     The parties entered into a binding and enforceable contractual relationship when they agreed that Fifth Third would send foreign currency transfers from funds it would receive from an Upsher-Smith account at JPMorgan.  That contract, drafted and required by Fifth Third, is established and/or evidenced by the completed FX Customer Information Form required by Fifth Third Bank.

84.     Fifth Third formed and entered into a valid and binding contract with Upsher-Smith whereby Upsher-Smith agreed to use Fifth Third as its bank for foreign currency wire transfers, and Fifth Third agreed to execute such transfers in accordance with the FX Customer Information Form, which requires a "Primary Confirmation Contact" and a "Secondary Confirmation Contact" for all foreign currency wire transfers.

85.     Upsher-Smith performed any and all conditions precedent to the extent that they were required by the contract between the parties.

86.     By the conduct discussed herein, notably including failure to obtain two independent confirmations that Fifth Third was authorized to effectuate the Transfers from both a Primary and a Secondary Confirmation Contact, failure to communicate in writing about transactions with more than one Upsher-Smith employee, and failure to comply with its own policies regarding the significant risks associated with transactions of this kind, Fifth Third violated the security protocol set forth in the FX Customer Information Form and the parties' agreement and course of dealing, and breached the contract between the parties.

87.     As a direct and proximate result of Fifth Third's breach of contract, Upsher-Smith has been harmed and is entitled to damages, including without limitation Upsher-Smith's direct losses of $39,794,783.53, interest, expenses, fees and other consequential losses.

## COUNT II
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

88.     Upsher-Smith restates and incorporates by reference each and every paragraph of this Complaint as if fully set forth herein.

89.     Based upon the contract identified above, Fifth Third is subject to a covenant of good faith and fair dealing to Upsher-Smith.

90.     By the above-described conduct, Fifth Third has breached the covenant of good faith and fair dealing.  This conduct evaded the spirit of the parties' contract and

breached duties fairly inferable from the express terms of said contract.  This conduct includes, but is not limited to arbitrarily exercising contractual discretion and hindering contractual performance by Upsher-Smith.  Fifth Third further evaded the spirit of the parties' contract and breached duties fairly inferable from the express terms of that contract by, for example, failing to comply with its own internal policies governing funds transfers such as those at issue.

91.     In breaching the covenant of good faith and fair dealing, Fifth Third acted in bad faith and with an ulterior motive.

92.     As a result of said breach, Upsher-Smith has been harmed and is entitled to damages, including without limitation Upsher-Smith's direct losses of $39,794,783.53, interest, expenses, fees and other consequential losses.

### COUNT III
**(Article 4A-202 of the Uniform Commercial Code)**

93.     Upsher-Smith restates and incorporates by reference each and every paragraph of this Complaint as if fully set forth herein.

94.     Pursuant to Minn. Stat. § 336.4A-204, a bank is obligated to reimburse a customer for funds transferred pursuant to a payment order that is not authorized and not effective as an order of the customer under Minn. Stat. § 336.4A-202.

95.     None of the Transfers initiated by the AP Coordinator were authorized by Upsher-Smith, and they were not effective as an order of Upsher-Smith pursuant to Minn. Stat. § 336.4A-202.

96.     The AP Coordinator did not have authority to initiate the Transfers.

27

97.     The security procedure for foreign wire transfers in place at Fifth Third was not a commercially reasonable method of providing security against unauthorized payment orders.

98.     Fifth Third did not accept any payment order related to the Transfers in good faith.

99.     Fifth Third's acceptance of the payment orders associated with the Transfers was not in compliance with the written agreement or instruction of Upsher-Smith restricting acceptance of payment orders issued in the name of Upsher-Smith. Specifically, Fifth Third failed to obtain a Primary Confirmation and a Secondary Confirmation from two Upsher-Smith representatives.

100.    Fifth Third's actions in effecting the unauthorized Transfers were not in compliance with Article 4A-202 of the Uniform Commercial Code or Minn. Stat. § 336.4A-202.

101.    Within one year of the first fraudulent wire transfer on May 29, 2014, Upsher-Smith provided Fifth Third with written objection to Fifth Third's payment of Transfers that are the subject of this action, consistent with Minn. Stat. § 336.4A-505.

102.    Fifth Third has failed and/or refused to reimburse Upsher-Smith for the unauthorized Transfers as required by Minn. Stat. § 336.4A-204.

103.    As a direct and proximate result of Fifth Third's conduct in effecting the unauthorized Transfers, Upsher-Smith has been harmed and is entitled to damages, including without limitation a refund of Upsher-Smith's direct losses of $39,794,783.53, interest, expenses, fees and other consequential losses.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Upsher-Smith prays this Court for an Order granting the following relief:

1.      Award Upsher-Smith damages in an amount in excess of $50,000;

2.      Award Upsher-Smith its costs, disbursements and attorneys' fees to the extent allowed by law; and

3.      Award such other and further relief as the Court may deem just and equitable.

## DEMAND FOR A JURY TRIAL

Upsher-Smith demands a jury trial on any and all claims or issues in this matter so triable.


**ANTHONY OSTLUND**
**BAER & LOUWAGIE P.A.**


Dated:  August 7, 2017          By: *s/Richard T. Ostlund*
                                        Richard T. Ostlund (#0144277)
                                        Randy G. Gullickson (#0185607)
                                        Steven C. Kerbaugh (#0390429)
                                 3600 Wells Fargo Center
                                 90 South Seventh Street
                                 Minneapolis, MN  55402
                                 Telephone:  612-349-6969

                                 rostlund@anthonyostlund.com
                                 rgullickson@anthonyostlund.com
                                 skerbaugh@anthonyostlund.com

                                 **ATTORNEYS FOR PLAINTIFF**