## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| UPSHER-SMITH LABORATORIES, INC., | Civ. No. 16-556 (JRT/HB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION & ORDER** |
| FIFTH THIRD BANK, | |
| Defendant. | |

Randy G. Gullickson and Richard T. Ostlund, **ANTHONY OSTLUND BAER & LOUWAGIE PA,** 90 South Seventh Street, Suite 3600, Minneapolis, MN 55402, for plaintiff.

Jeffrey A. Miller and Victor A. Walton, **VORYS, SATER, SEYMOUR AND PEASE LLP,** 301 East Fourth Street, Suite 3500, Cincinnati, OH 45202, and Jennifer L. Cornell, **NILAN JOHNSON LEWIS PA,** 120 South Sixth Street, Suite 400, Minneapolis, MN 55402, for defendant.

This case arises out of a dispute over fraudulent transactions instigated by an unknown third-party against Plaintiff Upsher-Smith Laboratories, Inc. ("Upsher"). Upsher is a Minnesota-based pharmaceutical company. In 2013, Upsher hired Defendant Fifth Third Bank ("FTB") to carry out foreign currency transactions on its behalf. In May and June of 2014, an Upsher employee was defrauded into requesting nine separate payments totaling over $52 million in foreign currencies to banks in China and Slovakia. FTB executed the payments at the employee's request. Upsher brought this action against FTB in March 2016, alleging breach of contract, breach of the implied covenant of good faith

1

and fair dealing, and violations of Minn. Stat. § 335.4A ("Article 4A"). FTB raised various affirmative defenses.

Five motions are now before the Court: (1) Upsher's partial motion for summary judgment on its breach of contract claim and some of FTB's affirmative defenses; (2) FTB's motion for summary judgment on all claims; and (3) FTB's motions to exclude the expert testimony of three witnesses. Because the Court finds that Article 4A of the Uniform Commercial Code applies to this dispute and preempts Upsher's breach of contract claim, it will grant summary judgment to FTB on that claim. Because there are genuine disputes of material fact as to whether FTB followed commercially reasonable security protocol in good faith when carrying out the fraudulent transactions, the Court will deny summary judgment for FTB on Upsher's Article 4A claim. Finally, because the expert witness testimony is relevant and reliable, the Court will deny FTB's motions to exclude expert testimony.

## BACKGROUND

## I.   UPSHER AND FTB'S BUSINESS RELATIONSHIP

Upsher is a Minnesota company specializing in the manufacture, distribution, and sale of pharmaceutical products.[1] (Am. Compl. ("Compl.") ¶ 7, Aug. 7, 2017, Docket No. 65.) FTB is an Ohio banking corporation. (Compl. ¶ 8.) In June 2012, Upsher entered into a credit agreement with a syndicate of banks, allowing it to draw on a credit line for

---

[1] At the time of the events giving rise to this action, Upsher was a corporation. (Compl. ¶ 7.) It is now a limited liability company. (*See* 1st Decl. of Nathan Colvin ¶ 12, Ex. 9 at 9-10, July 13, 2018, Docket No. 214.)

needed funds.  (Compl. ¶ 12; Answer to Am. Compl. ("Answer") ¶ 12, Aug. 21, 2017, Docket No. 69.)  JPMorgan Chase ("JPMorgan"), the bank that maintained Upsher's principal operating account, was one of three lead banks involved in the deal.  (Compl. ¶ 12, Answer ¶ 12.)  FTB was one of several banks designated to provide credit to Upsher should the need arise.  (Compl. ¶ 13, Answer ¶13.)

Upsher at times makes payments to foreign vendors in foreign currencies ("FX transfers").[2]  (Compl. ¶ 16.)  Prior to August 2013, Upsher used Cambridge Mercantile Corp. to conduct its FX transfers.  (Decl. of Nan Smith ("Smith Decl.") ¶ 5, July 13, 2018, Docket No. 282.)  Around the time Upsher entered into the credit agreement with the syndicate of banks, however, Upsher and FTB began discussing moving Upsher's FX transfer business to FTB.  (Decl. of Stephen Robinson ("Robinson Decl.") ¶¶ 3-10, May 26, 2016, Docket No. 27.)  Although the details of those discussions are unclear, Upsher contends that they were initiated by Neil Brenner, an FTB employee based in Minneapolis who was interested in additional business opportunities with Upsher.  (Compl. ¶¶ 14-15; Robinson Decl. ¶¶ 5-6, 9.)  By August 2013, Upsher had shifted its FX transfer business to FTB.  (Compl. ¶ 15.)

Before the shift occurred, Nan Smith, Upsher's Corporate Accounting Manager, met with Brenner to discuss how the FX transfer process would work.  (1ˢᵗ Decl. of Nathan Colvin ("1ˢᵗ Colvin Decl.") ¶ 10, Ex. 7 ("Smith Dep.") at 41, July 13, 2018, Docket No.

---

[2] Upsher refers to these transfers as "foreign currency wire transfers."  (Compl. ¶¶ 15-17.) FTB refers to the transactions as "foreign exchange ("FX") trading services."  (Answer at 1-2.) For simplicity, the Court will refer to the transactions in issue as "FX transfers" or "transactions."

212.)  Smith recalls that she and Brenner agreed to use the same procedures Upsher had used with Cambridge.  (*Id.*)  Brenner also met with Christine Hopper, the Upsher employee tasked with managing its FX transfers, and Seazon Patterson, another employee, to discuss the transition.  (1st Colvin Decl. ¶ 7, Ex. 4 ("Hopper Dep.") at 43-44; 51, July 13, 2018, Docket No. 209.)  Like Smith, Hopper expressed a desire to keep the process consistent with the process used with Cambridge.  (*Id.* at 44-45, 53, 57.)  Under that process, Upsher employees would send requests for FX transfers to FTB via email, multiple employees would be copied on those emails, and FTB would send an initial response to any Upsher employees originally copied.  (*Id.* at 51-54)  Brenner does not recall what procedures he agreed FTB would follow.  (5th Decl. of Nathan Colvin ("5th Colvin Decl.") ¶ 4, Ex. 1 ("Brenner Dep.") at 77 Aug. 3, 2018, Docket No. 367-1.)

To set up Upsher's account in its systems, FTB required that Upsher fill out a form entitled "FX Customer Profile" ("FX Profile").  (Compl. ¶ 18; Answer ¶ 18.)  The blank FX Profile was sent via email to Smith.  (1st Colvin Decl. ¶ 14, Ex. 11 at 2-3, Docket No. 205-1.)  That email identified the FX Profile as the only "required documentation" and stated that the "information is being requested, and is required to be returned, at the time of setup of your FX Account to meet compliance requirements." (*Id.* at 3.)  The FX Profile itself included a statement that the form was "for internal use only."  (Decl. of Steven C. Kerbaugh ("Kerbaugh Decl.") ¶ 5, Ex. 21 ("FX Profile"), July 13, 2018, Docket No. 305.)  Before filling out the FX Profile, Smith replied to the email, indicating she would wait for Seazon Patterson, Upsher's new Accounts Payable Manager, to fill out the form.  (1st Colvin Decl. ¶ 14, Ex. 11 at 2.)

4

On July 30, 2013, Upsher sent the completed FX Profile to FTB.  (Compl. ¶ 19.)
Upsher listed Christine Hopper as the "primary confirmation contact" for FX trades,
Patterson as the "secondary confirmation contact," and Smith as an "optional confirmation
contact."  (FX Profile.)  All three of the employees' email addresses and phone numbers
were included on the form, along with the finance department's fax number.  (*See id.*)

After receiving the FX Profile, FTB set up Upsher's account and sent Upsher a
"Foreign Exchange Agreement," a standard form used by FTB.  (1ˢᵗ Colvin Decl. ¶ 17, Ex.
14 ("FX Agreement") at 5-10, Docket No. 205-2.)  The FX Agreement stated that all FX
transactions would be subject to its terms.  (FX Agreement ¶ 1.)  It also stated that FTB
would send Upsher a confirmation for each transaction, indicated that Upsher was
"responsible for promptly reviewing each Confirmation," and required Upsher to notify
FTB within one business day of receipt of said confirmations about any discrepancies.  (*Id.*
¶ 7.)  However, neither FTB nor Upsher ever signed the FX Agreement.  (*Id.* at 10.)  In
fact, in an email, an FTB employee told Smith and Patterson that the "FX Agreement [was]
not required to be returned under any deadline" because Upsher expected to request spot-
only transactions. (*Id.* at 1.)

## II.    THE FX TRANSFER PROCESS AND PROTOCOL

Between late August 2013 and May 2014, FTB conducted 61 non-fraudulent FX
transfers for Upsher, all within the United Kingdom, Western Europe, or Canada.
(Kerbaugh Decl. ¶ 4, Ex. 14 ("Transfer Summ.") at 2-4, Docket No. 299.)  All but two of
these transactions involved amounts under $500,000, and most were under $100,000.  (*Id.*)

As the Upsher employee tasked with managing FX transfers, Hopper sent the payment orders for nearly all of these transactions. (*See* Smith Dep. at 41-42.)

The parties dispute the proper characterization of the transactions. Upsher refers to the FX transfers as "foreign currency wire[s]" or "third party funds transfers." (Compl. ¶ 1.) FTB disputes that the FX transfers at issue were "wire transfers" and refers to them as "foreign exchange . . . trading services." (Answer at 1-2.) Nomenclature aside, the record indicates that the transactions involved two major steps. First, Upsher went to FTB to exchange U.S. dollars for foreign currency. (*See* Kerbaugh Decl. ¶ 3, Ex. 11 ("Doyle Rep.") at 4, n.1, July 31, 2018, Docket No. 296.) Then, FTB initiated a third-party payment of the foreign currency to the beneficiary designated by Upsher.[3] (*Id.*)

Because of the risks of fraud and money laundering involved in third-party payments, FTB's Policy Manual states that, prior to making any FX transfers, FTB and its counterparty should "mutually agree on procedures and practices to ensure that business is conducted in a safe and sound manner." (Kerbaugh Decl. ¶ 5, Ex. 25 at 12, 20, Docket No. 309.) Brenner does not recall whether he spoke with Smith, Hopper, or Patterson at any point about the inherent risks involved in the FX transfer process, nor does he recall in detail what procedures they discussed or agreed to follow. (Brenner Dep. at 77, 151) Although a risk disclosure form was attached to the FX Agreement sent to Upsher, (FX

---

[3] According to FTB's Policy Manual, a third-party payment is "the transfer of funds in settlement of an FX transaction to the account of an institution or corporation other than that of the counterparty to the transaction." (Kerbaugh Decl. ¶ 5, Ex. 25 at 20, Docket No. 309.) Thus, the FX transfers in issue involved both "third-party payments" and a "transfer of funds" as defined by FTB.

Agreement at 11-13), there is no evidence that Brenner or anyone else at FTB required any Upsher employee to acknowledge these risks.

Whether by explicit agreement or otherwise, the parties followed a pattern of procedures for setting up and confirming FX transfers. First, a senior Upsher employee would notify Hopper of the need for a transfer. (Decl. of Nan Smith ¶¶ 6-7, 9, July 13, 2018, Docket No. 282.) Hopper would then email Brenner at FTB, copying Patterson or, after Patterson's departure from Upsher, her replacement, Hope Jackson.[4] (*Id.* ¶ 8; *see also* Hopper Dep. at 65-66, 104.) The initial emails from Hopper included the amount needed in USD, the foreign currency needed, and the foreign beneficiary's details. (Transfer Summ. at 5-6.) FTB would respond to Hopper's request via email, confirming the amount and offering an exchange rate. (Hopper Dep. at 66.) Brenner would "reply all" on emails from Upsher so that anyone originally included would receive his response. (Brenner Dep. at 170; Compl. ¶ 22; Transfer Summ. at 11-12.)

Following the confirmation email to Hopper, FTB would call Hopper to confirm the details. (Hopper Dep. at 39-40, 67.) FTB would then send a fax confirmation to Upsher's finance department. (*Id.* at 39, 67.) Each fax contained stated terms, including that Upsher was obligated to notify FTB of discrepancies within 24 hours and that failure to do so would constitute an agreement with the confirmation. (1st Colvin Decl. ¶ 18, Ex. 15 at 2, Docket No. 218.) Hopper would then give a copy of the fax confirmation to Andrea

---

[4] While there are a small number of emails to FTB wherein Hopper did **not** copy anyone else at Upsher, these do not appear to include any initial requests for transfers. (*See, e.g.*, Transfer Summ. at 142-144.)

Zimmerman, a senior accountant.  (Hopper Dep. at 68.)  Zimmerman stapled the faxes to the daily cash reports for Upsher's JPMorgan account.  (1st Colvin Decl. ¶ 4, Ex. 1 ("Zimmerman Dep.") at 57-58, July 13, 2018, Docket No. 206.)

## III.    THE FRAUDULENT TRANSACTIONS

On May 29, 2014, Hopper received an email purporting to be from Mark Evenstad, Upsher's CEO.  (Hopper Dep. at 106-107.)  That email indicated that Hopper would receive a separate email from an attorney named David Madison, who would write to Hopper from the address davidmadison@lawyer.com.  (Kerbaugh Decl. ¶ 5, Ex. 32, Docket No. 316.) The person purporting to be Evenstad gave Hopper the following details:  the email from Madison would involve the acquisition of a company by Upsher; Evenstad would need Hopper's assistance as part of that process; he ("Evenstad") had given full power of attorney to Madison; Hopper should "execute everything [Madison] needs"; for confidentiality reasons, all communications would need to be over email;  any questions Hopper may have should be directed to Madison; and, finally, Hopper was the only other employee aware of the acquisition and so should keep all information private pending public announcement.  (*Id.*)

Hopper replied to the "Evenstad" email that day, indicating she would do her best to complete Madison's requests.  (Kerbaugh Decl. ¶ 5, Ex. 22 at 2-3, July 13, 2018, Docket No. 306.)  In the past, the real Evenstad had occasionally taken actions that did not adhere to normal protocol, which apparently influenced Hopper's decision to follow the email's instructions.  (Smith Dep. at 91, 130, 147-48; 1st Colvin Decl. ¶ 8, Ex. 5 ("Robinson Dep.")

at 35-36.) When Evenstad did so, employees would refer to it as "a Mark E thing." (*See* Smith Dep at 147-48.) Hopper later referred to the May 29, 2014 request as a "Mark E thing," indicating she may have believed that, while unusual, his request was not entirely out of character. (*Id.* at 146.)

Later that day, a man purporting to be Madison called Hopper. He had a foreign accent. (Hopper Dep. at 112.) He told Hopper that if she didn't keep information about the acquisition confidential, the acquisition and people's jobs would be in jeopardy. (*Id.* at 113.) Madison also told Hopper that he would need information about Upsher's bank accounts. (*Id.* at 111.) Hopper then asked Smith about the daily transfer limit. (Smith Dep. at 101.) Smith called FTB to ask about the limit, and Melissa Sullivan, an FTB employee, informed her it was $25 million. (*Id.* at 102; Compl. ¶¶ 33, 35.) Throughout the day, May 29, Hopper and Madison exchanged several more emails. (Kerbaugh Decl. ¶ 5, Ex. 17, Docket No. 302.) Therein, Hopper shared Upsher's account information with Madison and informed him the daily FX transfer limit was $25 million. (*Id.* at 3.)

On the afternoon of May 29 and at Madison's direction, Hopper initiated a request for $1,285,034 to be transferred to CBSC Investment Bank in China. (1st Colvin Decl. ¶ 27, Ex. 24, Docket No. 205-5.) As usual, she emailed Brenner and Sullivan at FTB, but this time she did not copy another Upsher employee as was her normal practice. (*Id.*) As such, only Hopper, Brenner, and Sullivan were aware of the request. This was not the only unusual characteristic of the request. In the email, Hopper stated that "this cannot wait the two day cycle we normally do." (*Id.* at 2.) She also asked that Brenner and Sullivan contact her directly with questions because the transfer was "a confidential matter." (*Id.*) She

further requested that they email the confirmation to her directly instead of faxing it and, if unable to do so, that someone call her directly so that she "could be ready to grab [the fax]." (*Id.*)

Sullivan completed the trade and emailed Hopper a confirmation but decided to also fax a confirmation to Upsher at the usual fax number. (*Id.* at 1; Hopper Dep. at 145.) Instead of giving a copy of the fax confirmation to Andrea Zimmerman, Hopper picked up the fax and put it in her desk without recording the transaction in the company ledger. (Hopper Dep. at 146.) Knowing that Zimmerman would see a $1.285 million withdrawal from Upsher's JPMorgan account, Hopper told Zimmerman to expect to see "a wire" and "to keep it quiet." (Zimmerman Dep. at 118.) Although she was not following protocol, Zimmerman trusted that Hopper was "doing her job" and following directions. (*Id.* at 120.)

On June 2 – after a second fraudulent transaction had been completed – JPMorgan emailed Nan Smith to warn her about fraudsters using fake email addresses to obtain cash through wire transfers. (1st Colvin Decl. ¶ 33, Ex. 30, Docket No. 230.) Smith forwarded the email to Hopper and the rest of Upsher's finance department. (*Id.*) It described the scenario Hopper was involved in almost exactly, stating that "in a typical scenario, a fraudster gains access to the company's email system and uses the CFO's email account to send instructions for a wire payment." (*Id.*) The email also instructed employees to "always validate new payment instructions received via email, even if the email is internal and/or from a known sender" and recommended calling the sender "to verify." (*Id.*) Hopper does not remember reviewing the email but concedes she probably did. (Hopper Dep. at 178.)

Between May 29 and June 16, 2014, Hopper requested a total of nine FX transfers at Madison's direction, all of which FTB executed. (Kerbaugh Decl. ¶ 4, Ex. 15 at 2, Docket No. 300.) The transfers ranged in amount from approximately $726,000 to $12 million, for a total of $52.5 million.[5] (Compl. ¶ 72.) All were to banks in China or Slovakia. (*Id.* ¶ 20.) In comparison to the usual FX transfers requested by Upsher, these transfers were for much larger sums than was typical and were to countries with which Upsher did not typically transact. (*See id.* at ¶ 75; Transfer Summ. at 2.)

Despite the unusual characteristics of the transactions, including their amounts, short turn-around, and confidential nature, Brenner and Sullivan executed them without question, following Hopper's requests for secrecy. (*See* Kerbaugh Decl. ¶ 5, Exs. 35, 37, 39, 42, 45, Docket Nos. 319, 321, 323, 326, 331.) However, they did recognize that the requests were out of the ordinary and expressed curiosity about the situation to one another. In one conversation, Brenner repeatedly stated to Sullivan that he thought "something [wa]s going down" at Upsher. (5th Colvin Decl. ¶ 14, Ex. 11 at 1, Docket No. 367-7.) Brenner then stated that he believed that Upsher was "going public," which could explain the large requests. (*Id.* at 2.) He also told Sullivan that Hopper "didn't know anything" and was "kind of just whatever kind of person there." (*Id.*)

Meanwhile, despite the rapid depletion of funds from Upsher's JPMorgan account, no one at Upsher other than Hopper or Zimmerman noticed something unusual was occurring until June 9. (1st Colvin Decl. ¶ 5, Ex. 2 ("Bodin Dep.") at 96, Docket No. 207.) On that

---

[5] FTB was able to recover some of that total for Upsher, reducing the total loss to $39 million. (Compl. ¶¶ 73-74.)

date, Nancy Bodin, who audited Upsher's ledger and bank accounts, noticed that there was a $1.2 million deduction from the JPMorgan account that was unaccounted for in the company ledger. (*Id.* at 95.) Bodin emailed Hopper, Zimmerman, and Jackson about the discrepancy. (*Id.* at 97-98, 99.) When Hopper told Jackson, who was her senior, that she could not share details of the transaction, Jackson went to her own manager, Bruce Loch, who wanted to wait before contacting Mark Evenstad about the issue. (1st Colvin Decl. ¶ 21, Ex. 18 ("Jackson Dep.") at 91-92, Docket No. 221.) After word got to Nan Smith and then Robinson, Upsher's CFO, Robinson informed her that he would talk to Evenstad. (Smith Dep. at 146-47.) Meanwhile, Upsher's operating account dipped to almost -$1 million. (Zimmerman Dep. at 162.)

On June 12, Robinson finally asked Evenstad about the $1.2 million FX transfer that was unaccounted for. (Robinson Dep. at 71-72.) Evenstad replied that he was not sure whether he had authorized that transaction. (*Id.*) Robinson then looked for Hopper, who was out for a long weekend and would not be returning until June 17. (*Id.* at 72-73.) While she was away, however, Hopper placed requests for two more FX transfers at Madison's direction. (Hopper Dep. at 277-281.) FTB carried them out. (*See* Compl. ¶ 72.)

Robinson and Evenstad finally realized Upsher had been defrauded on June 17, when Hopper shared a copy of the initial email from "Evenstad" with Robinson. (Robinson Dep. at 83-85.) Upsher and FTB then communicated about the fraudulent transactions for the first time. (*Id.* at 86.) FTB was able to recover $12 million of the total sum lost and returned it to Upsher. (*Id.* at 87.)

Following Upsher's discovery of the fraud, the FBI began investigating what it told Evenstad was a "worldwide foreign crime." (Evenstad Dep. at 69.) At the same time, PricewaterhouseCoopers ("PwC") conducted an internal investigation and determined that the "tone at the top" of the company was "inappropriate" such that "the finance staff felt the fraudulent email could have been truthful" and "did not feel comfortable enough to communicate with [Evenstad] or any supervisor." (1st Colvin Decl. ¶ 60, Ex. 57 at 2, Docket No. 271.) PwC also found issue with the finance department's failure to review the company's journals sooner. (1st Colvin Decl. ¶ 61, Ex. 58 at 4, Docket No. 272.) Upsher now exists as Acova, LLC, with Evenstad as CEO. (Evenstad Dep. at 10-11.)

On August 7, 2017, Upsher filed a First Amended Complaint, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and failure to comply with Article 4A of the UCC. (Compl.) FTB asserted the following affirmative defenses: (1) Upsher's claims are barred by the terms and conditions of contractual or other documents, the parties' past practices and/or course of performance; (2) impossibility and/or impracticability of performance; (3) estoppel, laches, waiver and/or unclean hands; (4) contributory and/or comparative fault, contributory and/or comparative negligence, and/or Minn. Stat. § 604.01; (5) Upsher's failure to exercise ordinary care; and (5) the applicable statutes of limitations and/or repose. (Answer ¶¶ 106-08, 114-15, 117.) FTB further asserts that any alleged damages were caused by Upsher's or its employee's actions, over which FTB had no control. (*Id.* ¶ 112.)

FTB moves for summary judgment on each of Upsher's claims. FTB also presents three motions to exclude expert testimony. Upsher moves for summary judgment on its breach of contract claim and on FTB's affirmative defenses.

## DISCUSSION

## I.    CROSS MOTIONS FOR SUMMARY JUDGMENT

### A.    Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B.    Choice of Law

FTB and Upsher dispute whether Minnesota, New York, or Ohio law governs this dispute. Because the Court finds that its conclusions would be the same under any state's laws, it will not undergo a choice-of-law analysis.

### C.     Article 4A of the Uniform Commercial Code

Article 4A of the Uniform Commercial Code ("U.C.C.") invalidates payment orders that are "not authorized and not effective as the order of the customer or . . . not enforceable . . . ." Minn. Stat. § 336.4A-204 (2018). Upsher argues that it is entitled to a refund for all the fraudulent FX transfers because they were neither authorized nor effective. FTB moves for summary judgment on Upsher's Article 4A claim on three grounds: (1) the statute is inapplicable; (2) Upsher authorized the fraudulent transactions; and (3) FTB followed commercially reasonable security procedures.

### 1.     Applicability of Article 4A

FTB argues that FX transfers are "goods" within the meaning of Article 2 of the U.C.C., which "applies to transactions in goods" "unless the context otherwise requires." Minn. Stat. § 336.2-102. FTB further argues that application of Article 2 precludes application of Article 4A in this dispute.

 Article 2 defines goods as "all things . . . which are movable at the time of identification to the contract for sale **other than the money in which the price is to be paid** . . . ." Minn. Stat. § 336.2-105. However, under New York law, money may be a "good" when it is the object – rather than the medium – of exchange. *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 355 (2d Cir. 1992). Where this principle applies,

"[t]he provisions of Article 2 governing 'transactions in goods' . . . also apply to foreign currency transactions where . . . foreign currency is traded as a commodity." *Compania Sud-Americana De Vapores, S.A. v. IBJ Schroder Bank and Trust Co.*, 785 F. Supp. 411, 431 n.19 (S.D.N.Y. 1992).

This precedent establishes that **if** New York law applied to this dispute, Upsher would be free to bring a claim under Article 2. However, no court in the cases cited by Upsher held that Article 2 is the **only** available route for a plaintiff disputing a foreign currency exchange. In fact, none of those opinions even mentions Article 4A.[6] As such, the Court finds that Article 2 does not preclude application of Article 4A.

Thus, the plain language of the statute will determine whether Article 4A applies to this dispute. Article 4A applies to "funds transfers." Minn. Stat. § 336.4A-102. Applicable definitions are as follows:

- "Payment order" means an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or cause another bank to pay, a fixed or determinable amount of money to a beneficiary. . ..
- "Beneficiary" means the person to be paid by the beneficiary's bank.
- "Receiving bank" means the bank to which the sender's instruction is addressed.
- "Funds transfer" means the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order. The term includes any payment order issued by the originator's bank or an intermediary bank intended to carry out the originator's payment order. A funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's payment order.

---

[6] No court in Minnesota or Ohio has held that money constitutes a "good" under Article 2 when transmitted via foreign currency exchange.

- "Intermediary bank" means a receiving bank other than the originator's bank or the beneficiary's bank.
- "Originator" means the sender of the first payment order in a funds transfer.

*Id.* §§ 336.4A-103, 336.4A-104.  Here, Upsher issued payment orders when it "instructed," or "caused," FTB to pay a fixed amount of money to foreign beneficiaries.  As the sender of payment orders, Upsher was the "originator," while FTB was the "receiving bank" and the foreign party receiving payment was the "beneficiary."  When Upsher made a payment order, it initiated the "series of transactions" constituting a "funds transfer."  As such, the Court finds that Article 4A applies to this dispute.

### 2.    Authentication under Article 4A

Having determined that Article 4A applies, the Court must decide whether FTB is entitled to judgment as a matter of law on Upsher's Article 4A claim.  FTB argues that Upsher is not entitled to a refund because the FX transfers were authorized by Hopper and conducted pursuant to a commercially reasonable security procedure.

"Banks bear the risk of loss from unauthorized wire transfers (if certain conditions . . . are met)."  *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 88 (2d Cir. 2010).  "To avoid responsibility for fraudulent transfers under Article 4A . . . a financial institution must establish that a transfer is 'authorized' under Minn. Stat. § 336.4A-202(a) **or** 'verified' under § 336.4A-202(b)."  *Hedged Inv. Partners, L.P. v. Nw. Bank Minn., N.A.*, 578 N.W.2d 765, 772 (Minn. Ct. App. 1998).  "A payment order received by the receiving bank is the authorized order of the person identified as sender if that person authorized the

order or is otherwise bound by it under the law of agency."  Minn. Stat. § 336.4A-202(a).

However:

> If a bank and its customer have agreed that the authenticity of payment orders issued to the bank in the name of the customer as sender will be verified pursuant to a security procedure, a payment order received by the receiving bank is effective as the order of the customer, whether or not authorized.

§ 336.4A-202(b).  Describing the relationship between "authorized" and "verified" payment orders, the Comment to Section 4A-203 states, "if subsection (b) does not apply, the question of whether the customer is responsible for the order is determined by the law of agency."  *Hedged Inv. Partners, L.P.*, 578 N.W.2d at 773 (quoting Minn. Stat. Ann. § 336.4A-203 U.C.C. cmt. n. 1 (West Supp. 1998)).  Like the *Hedged Investment Partners* court, this Court finds that Sections 202(a) and (b) provide "alternative methods to ascertain[] whether a payment order is authentic."  *Id.*; *see also Regatos v. North Fork Bank*, 257 F. Supp. 2d 632, 641 (S.D.N.Y. 2003) ("A payment order accepted in good faith pursuant to a commercially reasonable security procedure is said to be 'effective' as the order of the customer because it can be properly verified . . .  Such an order is effective even if it is actually unauthorized.").

Accordingly, the Court must determine whether 202(a) or (b) applies.  Section 202(b) will apply when the parties have in place a "security procedure" as defined by Article 4A.  578 N.W.2d at 773.

> [A] '[s]ecurity procedure' means a procedure established by agreement of a customer and a receiving bank for the purpose of (i) verifying that a payment order or communication . . . is that of the customer, or (ii) detecting error in the transmission or the content of the payment order or communication.

Minn. Stat. § 336.4A-201. Where, as here, payment orders are submitted by electronic message, the parties may not be able to rely on traditional modes of authentication, such as a signature on a check. 578 N.W.2d at 776. Instead, "'the receiving bank relies on a security procedure pursuant to which the authenticity of the message can be 'tested' by various devices.'" *Id.* (quoting Minn. Stat. Ann. § 336.4A-203 U.C.C. cmt. n. 1). Although they dispute the details, the parties here undoubtedly relied on a security procedure to authenticate the FX transfers. At the very least, the record establishes that Upsher initiated each transfer via email and that FTB faxed Upsher a confirmation upon completion. The Court thus finds 202(b) applicable and need not turn to the issue of authorization.

When Section 202(b) applies, "the loss from an unauthorized funds transfer will be shifted to the customer when (1) the security procedure is commercially reasonable, and (2) the bank accepted the payment order (i) in good faith and (ii) in compliance with the security procedure." *Regatos*, 257 F. Supp. 2d at 640-41. While commercial reasonableness is a question of law for the court to decide, the elements of the security procedure are questions of fact. *See id.* at 646. Here, Upsher asserts that confirming each FX transfer with multiple employees was an integral part of the protocol the parties discussed and agreed to follow. However, FTB denies ever agreeing to this, and the evidence does not definitively support either party's position. While emails between the parties show that FTB typically sent a confirmation to multiple Upsher employees, FTB occasionally emailed Hopper alone. For its part, the FX Profile does not solve the problem;

while it may represent the parties' agreement to confirm transfers with two Upsher employees, it may just as easily be read as an information-gathering form.

Because there are questions of material fact surrounding what security procedures were in place, the Court cannot assess reasonableness with certainty, nor can it determine whether FTB followed the security procedures in good faith. However, the Court notes its doubts as to both issues. Of serious concern is FTB's apparent failure to undertake a risk assessment with Upsher prior to performing FX transfer services. According to FTB's own policies, risk assessment should have been routine. Likewise, FTB's relaxed approach to paperwork – particularly its failure to ensure that the FX Agreement was signed – suggests the security procedure in place may have been inadequate. The Court also notes the unusual nature of the fraudulent requests, including their amounts, the urgency with which they were sent, and Hopper's request for secrecy. While not decisive at this time, these factors cast doubt on FTB's good faith in carrying out the requests.

Accordingly, the Court will deny FTB's motion for summary judgment on Upsher's Article 4A claim.

### D.    Breach of Contract

FTB and Upsher present cross motions for summary judgment on Upsher's breach of contract claim. Upsher argues that the FX Profile constituted a contract requiring FTB to confirm FX transfers with at least two Upsher employees. Upsher further argues that FTB breached that contract by failing to confirm the fraudulent FX transfers with an employee other than Hopper. FTB counters that (1) Upsher's breach of contract claim is

preempted by Article 4A, and (2) even if it is not preempted, the FX Profile was not a contract. The Court will turn first to the question of preemption.

Finding that existing laws did not adequately address technological changes in payment methods, the drafters of Article 4A intended "to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment." Minn. Stat. Ann. § 336.4A-102 cmt. Prior to its passage, parties often used a common-law approach to resolving disputes over funds transfers. *Ma*, 597 F.3d at 89. However, "Article 4A rejected this piecemeal approach in favor of a more disciplined regime under which common law claims at odds with Article 4A are no longer permitted." *Id.*

Still, Article 4A does not bar all common law claims; instead, it bars common law claims only when they "create rights, duties, and liabilities inconsistent with Article 4A." *Patco Const. Co. v. People's United Bank*, 684 F.3d 197, 215 (1st Cir. 2012). As such, "the critical inquiry is whether [Article 4A's] provisions protect against the type of underlying injury or misconduct alleged in a claim." *Ma*, 597 F.3d at 89-90. *See also Impulse Trading, Inc. v. Norwest Bank Minn., N.A.,* 907 F. Supp. 1284, 1288-89 (D. Minn. 1990) (Article 4A preempts common law claims when conflicting or duplicative); *Thompson v. Citizens Nat'l Bank*, No. 1-14-CV-1197, 2016 WL 5076053, at *4 (N.D. Oh. Sept. 20, 2016) (applying Ohio law and finding that "[w]hen UCC Article 4A applies to common law claims, the UCC displaces those common law claims.").

Upsher's breach of contract claim is rooted in FTB's alleged failure to follow specific security procedures, resulting in the execution of unauthorized transfers. The

underlying injury is Upsher's loss of funds due to the payment of unauthorized funds transfers, which is precisely the type of injury Article 4A is intended to address. Likewise, FTB's alleged misconduct – failing to follow security protocol – is limited to conduct that falls squarely within the scope of Article 4A. That the conduct may also amount to a breach of contract does not in itself remove the dispute from the U.C.C.'s protections or give rise to an injury distinct from those addressed by the U.C.C. As such, the Court finds that Upsher's breach of contract claim is preempted by Article 4A and will grant summary judgment to FTB on that basis.

### E.    Breach of Implied Covenant of Good Faith and Fair Dealing

"[E]very contract includes an implied covenant of good faith and fair dealing requiring that one party not 'unjustifiably hinder' the other party's performance of the contract." *In re Hennepin Cty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995).[7] Upsher argues that in contracting with FTB, it fairly expected that FTB would follow its own internal policies, and FTB's failure to do so led to the execution of fraudulent transactions and hindering Upsher's performance of the contract.

Because the covenant arises from contract, "a cause of action for good faith and fair dealing cannot exist independent of the underlying breach of contract claim." *Orthomet, Inc. v. A.B. Med.*, 990 F.2d 387, 392 (8th Cir. 1993) (affirming summary judgment for defendant on breach of good faith and fair dealing claim where plaintiff's breach of contract

---

[7] *See also 511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 746 N.E. 2d 496, 501 (N.Y. Ct. App. 2002) ("In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance.").

claim was barred by statute of frauds).[8]  Because Upsher's underlying breach of contract claim is preempted by Article 4A, the Court must also grant summary judgment for FTB on Upsher's breach of the implied covenant of good faith and fair dealing claim.

### F.    FTB's Affirmative Defenses

FTB asserts that Upsher's claims are barred by:  (1) the parties' contractual terms, past practices, and course of performance; (2) the doctrines of impossibility and/or impracticability; (3) comparative fault and/or contributory negligence; (4) the equitable doctrines of estoppel, laches, waiver and/or unclean hands; and (5) applicable statutes of limitations and/or repose.   Upsher moves for summary judgment on each of these affirmative defenses.

### 1.    Contractual Terms, Past Practice, and Course of Performance

FTB asserts that Upsher's claims are barred by "the terms and conditions of certain contractual or other documents, the parties' past practices, and/or course of performance." (Answer ¶ 106.)  FTB contends that, pursuant to terms on the confirmation fax and in the unsigned FX Agreement, Upsher was required to notify FTB of any discrepancies in payments within 24 hours, thus barring its claims.  Citing the few instances where only one Upsher employee was included on emails to and from FTB, FTB also argues that the

---

[8] *See also Hammond v. Citibank, N.A.*, No. 2:10-CV-1071, 2012 WL 4009575, at *4 (S.D. Oh. Sept. 12, 2012) ("A covenant of good faith and fair dealing generally does not exist independently, but only attaches where there is a contractual relationship."); *Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992) (recognizing that under New York law, breach of the implied covenant of good faith and fair dealing is "merely a breach of the underlying contract").

parties' past practice and course of dealing shows it was not required to confirm every trade with a second Upsher employee.

Insofar as this defense applies to Upsher's common law claims, Upsher's motion for summary judgment on the defense will be denied as moot. Because there are disputes of fact over the parties' agreements and practices, the Court will also deny Upsher's motion as it applies to the Article 4A claim.

### 2.    Impossibility and Impracticability

FTB asserts the affirmative defenses of impossibility and impracticability of performance. (Answer ¶ 107.) Because they apply only to Upsher's breach of contract claim, the Court will deny Upsher's motion for summary judgment on these defenses as moot.

### 3.    Comparative Fault and Contributory Negligence

FTB argues that Upsher's claims are barred by its failure to exercise ordinary care, namely by failing to notice the fraudulent transactions and failing to notify FTB of discrepancies within a reasonable time. (Answer ¶¶ 112, 114.)

Insofar as FTB seeks to bar Upsher's Article 4A claim based on a contributory negligence theory, FTB misunderstands the relevance of a plaintiff's exercise of ordinary care in an Article 4A analysis. Article 4A does not provide plaintiffs with a cause of action based on negligence for which contributory negligence or comparative fault could provide a defense. The drafters of Article 4A, who intended to move disputes over wire transfers away from the common law, carefully considered the rights and responsibilities of parties

to wire transfers.  So too did they consider proper risk allocation.  *See* Minn. Stat. Ann. §

336.4A-102 U.C.C. cmt.  The result was a statute that looks first to financial institutions in

the case of unauthorized transfers to ask whether they followed reasonable security

measures and acted in good faith or had authorization from the issuing party.  A customer's

negligence is not part of this inquiry.

Indeed, the comment to Section 4A-204 explicitly addresses the consequences of a

customer's ordinary care or lack thereof:

> [T]he customer has a duty to exercise ordinary care to
> determine that the order was unauthorized . . . and to advise the
> bank of the relevant facts within a reasonable time not
> exceeding 90 days after receipt of notification. . . . [I]f the
> customer delays more than 90 days[,] the customer's duty has
> not been met. The only consequence of a failure of the
> customer to perform this duty is a loss of interest on the refund
> payable by the bank.

Minn. Stat. Ann. § 336.4A-204 U.C.C. cmt. n. 2.  Thus, while Upsher's alleged negligence

may be relevant to its claims for interest, it has no bearing on whether it is entitled to a

refund under Article 4A.  Any attempts to argue as much are misplaced.

Accordingly, the Court will grant Upsher's motion for summary judgment on this

affirmative defense as it applies to the Article 4A claim.  The Court will deny the motion

as moot as it relates to Upsher's common law claims.

### 4.    Equitable Defenses

FTB asserts the equitable defenses of estoppel, laches, waiver, and unclean hands.

(Answer ¶ 108.)  However, because Upsher's Article 4A is in law, not equity, equitable

defenses do not apply.  *See, e.g.*, *Moore v. Medtronic, Inc.*, No. Civ. 99-2066ADMAJB,

2001 WL 1636248, at *3 (D. Minn. July 30, 2001) ("as an equitable defense, laches is inapplicable to a breach of contract action."); *Chevron Corp. v. Salazar*, Nos. 11 Civ. 3718, 0691, 2011 WL 3628843, at *7 (S.D.N.Y. Aug. 17, 2011) ("[A]n unclean hands defense . . . applies only to equitable claims and remedies. . . ."). As such, the Court will grant Upsher's motion for summary judgment on this defense as it pertains to the Article 4A claim. It will deny the motion as moot as it applies to the common law claims.

### 5.   Statutes of Limitations or Repose

FTB argues that Upsher's claims are barred by "the applicable statutes of limitations and/or repose." (Answer ¶ 117.) Article 4A requires that a customer seeking a refund from a receiving bank notify that bank of its objection within one year of receiving notification of the payment. Minn. Stat. § 336.4A-505. Here, Upsher initially notified FTB of the fraudulent FX transfers on June 17, 2014, just under three weeks after the first fraudulent transfer. Upsher also sent a formal letter notifying FTB of its objection on May 22, 2015, less than one year after the first fraudulent transaction on May 29, 2014.

FTB argues that Upsher agreed to shorten the notice period to 24 hours. FTB relies on the disclaimer it included on the unsigned FX Agreement and on fax confirmations to Upsher, which purportedly required Upsher to notify FTB of discrepancies in payment within 24 hours. For support, FTB cites *Bonnema v. Heritage Bank NA-Willmar*, No. C9-01-1940, 2002 WL 1363985, at *3 (Minn. Ct. App. June 19, 2002). In that case, the court gave effect to an agreement reducing the applicable statute of limitations for common law claims to thirty days. *Id.* That case is inapposite, however, as it did not involve Article 4A

and, unlike the present dispute, involved a signed agreement by the parties to shorten the limitations period.

Even if Upsher had assented to a 24-hour notice period – which the Court sees no clear evidence of – there are legal barriers that prevent acknowledgement of such a clause. In Minnesota,[9] "parties . . . may limit the time within which an action may be brought to a period less than that fixed by the general statutes of limitation." *Prior Lake State Bank v. Nat'l Surety Corp* 80 N.W.2d 612, 616 (Minn. 1957). However, "such provisions . . . are construed strictly against the party invoking them." *Id.* In evaluating such a provision, a court "must first look to see if a specific statute prohibits the use of a different limitation period." *Henning Nelson Const. Co. v. Fireman's Fund American Life Ins. Co.*, 383 N.W.2d 645 (Minn. 1986). If not, the court must determine whether the contractual limitations period is reasonable in length. *Id.*

In the present case, the allegedly agreed-upon contractual limitation fails both prongs of Minnesota's test. The statute states that the "obligation to refund payment . . . may not be varied by agreement." Minn. Stat. § 336.4A-204(b). This reflects the legislators' intention that Article 4A – not a contractual provision – provide the exclusive means to resolve disputes involving funds transfers. FTB may not bargain its way out of the statute's requirements, nor may the Court recognize a contractual provision that is inconsistent with it. Moreover, even if there were no statutory barrier, reducing the applicable notice period from one year to 24 hours is almost certainly unreasonable. As

---

[9] Because FTB relied on Minnesota law in asserting this defense, the Court will apply Minnesota law in its analysis.

such, the Court will grant Upsher's motion for summary judgment on this affirmative defense.

## II.    MOTIONS TO EXCLUDE EXPERT TESTIMONY

### A.    Standard of Review

Expert testimony is governed by Federal Rule of Evidence 702.  Rule 702 provides the following:

> A witness who is qualified as an expert by knowledge, skill experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the factors of the case.

The district court acts as a gate keeper to ensure that the requirements of Rule 702 are met.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  In *Daubert*, the Supreme Court set out four non-exclusive factors for assessing the reliability of expert testimony:  (1) whether the theory or technique can be, and has been tested, (2) whether it has been subjected to peer review, (3) whether it has a known or potential error rate, and (4) whether it is generally accepted in the scientific community.  509 U.S. at 593-94.

The Eighth Circuit has held that "[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility."  *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006); *see also Kumho Tire Co. v. Carmichael*, 526

U.S. 137, 152 (1999) ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1996).

### B.    The Experts

FTB moves to exclude the expert testimony of three individuals: Michael J. Doyle, Nelson Everhardt, and Robert Geary.

Michael J. Doyle is the President at Credit Risk Advisors, LLC, and has nearly forty years of experience in the banking industry. (Doyle Rep. at 15-17.) In his current role, he provides credit risk advisory services to financial institutions. (*Id.* at 15.) He has experience developing policies for detecting and preventing fraud in various contexts. (*Id.*) While he has not managed FX transfers on-the-ground, Doyle has provided risk management and other services to customers engaging in FX transfers throughout his career. (1st Colvin Decl. ¶ 5, Ex. 2 at 11, 14, 18, Docket No. 243.)

Nelson F. Everhardt is an expert on anti-money laundering ("AML") compliance programs. (3d Decl. of Nathan L. Colvin ¶ 4, Ex. 1 at 2, July 13, 2018, Docket No. 342.) He serves as President of Everhardt & Associates, LLC, a consulting firm specializing in compliance solutions for the financial services industry. (*Id.*) He has extensive experience providing AML consulting services, speaking at international engagements on fraud and AML issues, and serving has an expert witness in litigation involving money laundering, fraud, international banking, and international wire transfers. (*Id.* at 1-2.)

Robert F. Geary is a risk management consultant who has worked in the banking industry for more than three decades. (4th Decl. of Nathan L. Colvin ("4th Colvin Decl.") ¶ 4, Ex. 1 at 18-23, July 13, 2018, Docket No. 354.) He has served on various boards of directors and committees in the industry. (*Id.*) In previous positions, Geary gained extensive experience with foreign exchange transactions, including as a manager for foreign exchange groups. (4th Colvin Decl. ¶ 5, Ex. 2 at 17-18, Docket No. 355.)

Upsher intends to offer the experts' opinions on various matters, including federal regulatory schemes, the risks arising from the services provided by FTB, whether FTB followed its own policies and complied with industry standards in its dealings with Upsher, the reasonableness of the security procedures employed by FTB, and the extent to which FTB's actions aligned with the parties' agreements and course of dealing. FTB's arguments with respect to the experts overlap almost completely; as such, the Court will address them together.

FTB first argues that each expert lacks the requisite expertise in the area of FX transfers. In assessing qualifications, the question is simply "whether the witness's training and expertise demonstrate a knowledge of the subject matter." *Moran v. Ford Motor Co.*, 476 F.2d 289, 291 (8th Cir. 1973). Here, each of the experts has knowledge, based on experience, that is likely to be useful in resolving this dispute, including knowledge of risk management, AML policies, global wire transfers, and industry norms. Even without operational experience with FX transfers, this knowledge renders the witnesses qualified.

FTB also argues that the experts' opinions are unreliable, without sufficient factual basis, and irrelevant in certain respects. FTB asserts that the experts improperly rely on

their own experience rather than facts or data, failed to consider alternative causes of the fraud, and failed to consider testimony from current and former Upsher employees. None of these assertions supports a finding of unreliability. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion on cross-examination." *Hose*, 70 F.3d at 974 (citation omitted). "The only question relevant to . . . admissibility . . . is whether [the testimony] is sufficiently reliable and relevant to assist the jury's determination of a disputed issue." *Bonner*, 259 F.3d at 929. Each of the experts here reviewed the record and based their opinions on their extensive experience in banking. They need not have reviewed every deposition or considered every possible contributing cause for Upsher's injury. The Court finds their opinions, including those on AML laws, sufficiently reliable and relevant to Upsher's Article 4A claims. Any challenges to their credibility can be brought out on cross examination.

FTB also argues that if the experts testify on federal regulatory schemes, they will confuse and mislead the jury. The Court disagrees. Although Article 4A provides the specific framework for this dispute, placing the transactions into the broader scheme of federal regulations and risk prevention may help the jury assess industry norms. Nor should the experts' testimony be excluded on the basis that there may be contradictions in their testimony. If such issues arise, they will go to the credibility of the testimony, not its admissibility. *See Block v. Woo Young Medical Co.*, 937 F. Supp. 2d 1028, 1044 (D. Minn. 2013) (contradictions are a proper subject for cross examination).

Finally, FTB argues that the experts' testimony should be excluded because they offer improper legal conclusions. To the extent the experts' testimony veers into the realm of legal conclusions at trial, the Court will address the issue at that time. It will not exclude testimony based on speculation.

As such, the Court finds no basis to exclude the experts' testimony and will deny FTB's motions to exclude.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendant's Motion for Summary Judgment [Docket No. 203] is **GRANTED** as to Counts I-II and **DENIED** as to Count III.

2.     Plaintiff's Partial Motion for Summary Judgment [Docket No. 277] is **GRANTED** in part and **DENIED** in part as follows:

   a.     As to Count I, the Motion is **DENIED**.

   b.     As to the Defendant's affirmative defense on contractual terms, past practice, and course of performance, the Motion is **DENIED**.

   c.     As to the Defendant's affirmative defense of impossibility or impracticability, the Motion is **DENIED** as moot.

      d.      As to the Defendant's affirmative defense of comparative fault or contributory negligence, the Motion is **GRANTED** as to Count III and **DENIED** as moot as to Counts I-II.

      e.      As to the Defendant's equitable defenses, the Motion is **GRANTED** as to Count III and **DENIED** as moot as to Counts I-II.

      f.      As to Defendant's defense based on statutes of limitations or repose, the Motion is **GRANTED**.

3.      Defendant's Motions to Exclude Expert Testimony [Docket Nos. 233, 332, 350] are **DENIED.**

The parties shall show cause on or before seven (7) days from the date of this Order why the Court should not unseal the Order and specify any portion of the Order that warrants redaction.

DATED:  March 22, 2019                s/John R. Tunheim
at Minneapolis, Minnesota.            JOHN R. TUNHEIM
                                    Chief Judge
                         United States District Court